**In re McBURNEY LAW
SERVICES, INC.**

Nos. 2001–159–M.P., 2000–11–M.P.

Supreme Court of Rhode Island.

May 21, 2002.

William Alan Jacobson, William Mark Kolb, Providence, for plaintiff.

John G. Rallis, Providence, for defendant.

Present WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

GOLDBERG, Justice.

This case came before the Supreme Court on March 6, 2002, on petition for certiorari by the petitioner, McBurney Law Services, Inc. (McBurney or petitioner), to review a decision of the valuation panel appointed by this Court, pursuant to Article II, Rule 10(g) of the Supreme Court Rules, to determine the fair market value of shares of the petitioner corporation issued to Kevin McBurney (Kevin or respondent).

### Facts and Travel

The petitioner is a professional service corporation engaged in the practice of law; it was founded by John F. McBurney, Jr. in 1980 for, according to the record, the benefit of his children who are members of the bar. The respondent, who became a shareholder in McBurney in 1982, voluntarily terminated his employment and association with the corporation as of July 29, 1993. The termination of this relationship was less than amicable, and several disagreements arose among the shareholders, including a dispute over the percentage of respondent's ownership in the corporation and the number of shares lawfully issued in accordance with the articles of incorporation. The record discloses that respondent is the holder of twenty-five shares of common stock that McBurney maintains consists of an ownership interest of 25 percent of the corporation. The other shareholders, according to the testimony of John F. McBurney, Jr. and his wife, Ann McBurney, the office manager of McBurney, are John F. McBurney III, Christine McBurney and Mark McBurney. However, the articles of incorporation authorized the issuance of 100 shares of common stock to John F. McBurney, Jr. As of July 29, 1993 (the valuation date agreed to by the parties), when Kevin terminated his employment with the petitioner, there was a dispute about whether an additional 100 shares had been issued in excess of the number permitted by the articles of incorporation. Further, although the respondent is a professional service corporation engaged in the practice of law, and is governed by Rule 10(g),[1] neither respondent nor McBurney complied with Rule 10(g) or the provisions of G.L. 1956 chapter 5.1 of title 7, that govern professional service corporations, to which Rule 10(g) specifically refers. The record discloses

1. Article II, Rule 10 of the Supreme Court Rules, entitled "Professional service corporations and limited liability partnerships (limited liability entities)" provides that, in subsection (g): "If a shareholder dies or becomes ineligible, the professional service corporation shall: (1) Redeem the shareholder's shares * * * or (2) Cause the shareholder's shares to be purchased by an eligible person or persons."

that respondent did not transfer his shares to an eligible shareholder nor did he offer them to the corporation for redemption, as required by § 7–5.1–5. Similarly, McBurney did not comply with the obligations imposed by Rule 10(g) that require the professional service corporation, upon the ineligibility of a shareholder, to redeem the shareholder's shares or cause them to be purchased by an eligible person. Rule 10(g)(4) accords the corporation and the ineligible shareholder three months to agree on the fair market value of the shares or, failing an agreement on value, the corporation must apply to this Court for appointment of a valuation panel, "as provided by G.L.1956 * * * § 7–5.1–5, to determine the fair market value" of the shares. The record discloses that respondent, upon his voluntary departure from McBurney, never tendered his shares back to petitioner, nor did he indicate a willingness to have his shares redeemed.[2] On January 13, 2000, McBurney filed a petition for appointment of a valuation panel, to which the respondent objected. In an order entered on March 21, 2000, this Court granted the petition and appointed the valuation panel (panel).

On June 5, 2000, preparing for the evidentiary hearing scheduled by the panel, counsel for both parties entered into a written stipulation providing that respondent "shall be deemed to have owned 25% of the issued and outstanding shares of stock as of the [v]aluation [d]ate," thus relieving either party from the burden of proving, as Kevin maintained, that he owned a larger percentage of McBurney, or, as the petitioner maintained, that the shares issued to Kevin were over-issued shares and as such were void. The respondent subsequently moved to modify this stipulation. The respondent acknowl-

edged that the stipulation was not the result of any fraud or mistake, but rather, that it was based on information acquired later from respondent's 1988 tax returns that reflected the practice and custom of the parties as one-third shareholders for purposes of income, salary and benefits. Further, respondent admitted that his stock certificate reflected a 25 percent ownership in the corporation. The panel, in the absence of any reasoning, and over the objection of McBurney, granted the motion to modify the stipulation.

A decision regarding the value of the assets and liabilities of the petitioner as of the valuation date, including interest accruing from the date of Kevin's departure from McBurney, was issued by the panel. We note that the panel's determination of the value of the shares has not been challenged by either party. Indeed, such a challenge is unavailable in light of the provision in § 7–5.1–5 that the determination of the fair market value of the shares of the corporation by the panel "is final and binding upon the parties."

The petitioner has raised several issues before this Court, including whether the stipulation that was executed by counsel for both parties was subject to modification by the panel in the absence of agreement by both parties. Second, if the stipulation was appropriately set aside, an issue exists as to whether Kevin's shares and the shares of the other shareholders were issued in excess of the number of shares authorized by the articles of incorporation and thus, were void. The petitioner has argued that there is no evidence in the record to support the panel's findings that the original 100 shares that were issued to John F. McBurney, Jr. were canceled and 75 shares were reissued to respondent, John F. McBurney III and Christine

---

**2.** In testimony before the panel respondent denied that he was an ineligible shareholder and testified that he attempted to rejoin the firm in 1993 and 1994.

McBurney. The petitioner next challenges the award of prejudgment interest to an ineligible shareholder on the ground that interest is not provided by Rule 10(g), or § 7–5.1–5.[3] Further, if interest is allowable, an issue exists as to the appropriate commencement date. Finally, petitioner has argued that a valuation panel, appointed pursuant to Rule 10(g), has no authority to decide questions of law and may not issue a finding relative to the application of collateral estoppel or *res judicata* to cases pending in the Superior Court.

### Standard of Review

■ "Our review on a writ of certiorari is restricted to an examination of the record to determine whether any competent evidence supports the decision and whether the decision maker made any errors of law in that ruling." *Asadoorian v. Warwick School Committee*, 691 A.2d 573, 577 (R.I.1997). Furthermore, we must determine whether the decision was patently " 'arbitrary, discriminatory, or unfair.' " *D'Ambra v. North Providence School Committee*, 601 A.2d 1370, 1375 (R.I.1992).

### The Stipulation

■ Before hearings began in this case, counsel for the petitioner and the respondent stipulated, in writing, that the "[r]espondent shall be deemed to have owned 25% of the issued and outstanding shares of stock as of the [v]aluation [d]ate;" an agreement that reflected a compromise between the parties' conflicting positions. There has been no suggestion by either party that this stipulation was the product of fraud, mutual mistake or lack of consent. "We have stated previously that 'stipulated agreements [must] be placed on the record or * * * be reduced to an agreed-upon writing [to ensure] that the agreement itself does not become a source of further controversy and litigation.' " *DiLuglio v. Providence Auto Body, Inc.*, 755 A.2d 757, 776 (R.I. 2000) (quoting *E.W.H. & Associates v. Swift*, 618 A.2d 1287, 1288–89 (R.I.1993)).[4] The stipulation before us meets these conditions and should have been honored. A stipulation entered into with the assent of counsel and their clients, relative to an

---

**3.** General Laws 1956 § 7–5.1–5 entitled "**Eligibility of personnel—Transfer of stock**" provides in pertinent part: "(a) If any shareholder becomes ineligible, he or she shall transfer his or her shares to an eligible person, or offer them to the corporation for redemption at their fair market value. * * * [An] 'ineligible shareholder' includes a shareholder electing to retire or withdraw from active employment in the corporation."

**4.** The dissent maintains that a stipulation may be set aside if it is the product of fraud, duress, or mistake. However, that is simply not the situation before us. There is no suggestion that this stipulation was entered into as a result of fraud, duress or by mistake. Further, the cases cited by the dissent set forth the heavy burden a party faces in seeking to be relieved of a stipulation, and then only "where it becomes evident that 'the agreement was made under a clear mistake[,]' " and the mistake concerns issues of

law, that "are the province of courts, not of parties to a lawsuit * * *." *TI Federal Credit Union v. DelBonis*, 72 F.3d 921, 928 (1st Cir.1995). Moreover, a court must determine " 'whether there are overriding rules or policy considerations that compel granting or denying such relief[,]' " particularly where a disputed factual stipulation was " 'inadvertently incorporated therein[,]' " a situation that is clearly not before us. *MP Associates v. Liberty*, 771 A.2d 1040, 1049 (Me.2001). The panel never addressed any applicable policy considerations or otherwise made findings when it vacated the stipulation in this case. Finally, where, as here, "the stipulation partakes of the nature of a contract," there is authority that a court "can exercise no discretion in the matter whatever, except perhaps to relieve from fraud clearly shown." 73 Am. Jur.2d *Stipulations* § 12 (2001). We are satisfied that the stipulation in this case was in the nature of a binding contract and there is no suggestion of fraud.

evidentiary fact or an element of a claim, is conclusive upon the parties and removes the issue from the controversy. It is no longer a question for consideration by the tribunal. Therefore, absent an agreement of the parties to do so, a stipulation has the attributes of a consent order or consent judgment and cannot be set aside simply because a litigant no longer wants to be bound by its terms. *DeFusco v. Giorgio*, 440 A.2d 727, 729 (R.I.1982); *see also Hasman v. Hasman*, 655 A.2d 256, 257 (R.I.1995) (mem.). "Although a consent judgment receives a court's imprimatur, the judgment is in essence a contract between the parties to the litigation" and is to be construed as a contract. *Trahan v. Trahan*, 455 A.2d 1307, 1310 (R.I.1983). The record discloses that both parties to this dispute compromised their original positions, relative to respondent's percentage ownership in McBurney, thus removing this issue from the controversy and precluding the parties from challenging the stipulation at a later point. An order consented to by the parties can not be "opened, changed or set aside without the assent of the parties in the absence of fraud, mutual mistake or actual absence of consent[.]" *Douglas Construction and Supply Corp. v. Wholesale Center of North Main Street, Inc.*, 119 R.I. 449, 452, 379 A.2d 917, 918 (1977). None of those factors are present here. Further, respondent's counsel acknowledged that this stipulation was intended to resolve certain issues in the case and was not the result of any mistake but, instead, resulted from his lack of knowledge of his client's circumstances. Counsel acknowledged that when he discussed the stipulation with his client, he "prevailed upon him to agree to the 25 percent and stipulate to it because [he] didn't have any other evidence to support [respondent's] contention of a one-third interest until [he] saw [respondent's] 1988 tax return." We deem this to be an insufficient reason to modify a stipulation that was freely entered into by counsel with the actual consent of their clients.

■ In *Richardson v. Smith*, 691 A.2d 543 (R.I.1997), this Court reversed a decision of a trial justice that purported to vacate a consent order agreed to by the parties in the absence of the consent of both parties to the agreement. We held that it was clear error for the trial justice to vacate a stipulation entered into by the parties "without either first obtaining the consent of all parties or without a motion having been made and proof presented under [Super.R.Civ.P.] 60(b) establishing fraud, mutual mistake, the lack of actual consent or the existence of other extraordinary circumstances." *Richardson*, 691 A.2d at 546. When parties to litigation resolve issues through compromise and in good faith, it is well settled that "courts will enforce the compromised settlement 'without regard to what [the] result might, or would have been, had the parties chosen to litigate.'" *Mansolillo v. Employee Retirement Board of Providence*, 668 A.2d 313, 316 (R.I.1995) (quoting *Homar, Inc. v. North Farm Associates*, 445 A.2d 288, 290 (R.I.1982)). A party may not escape its obligations simply because one of the parties may not consider the agreement to be as palatable to them as when they entered into it. *Mansolillo*, 668 A.2d at 317.

■ On appeal, respondent has suggested that the modification of a binding stipulation is similar to a party's seeking relief from an admission made during the course of pre-trial discovery. We note, however, that this argument is of recent vintage. Indeed, in his written motion seeking to modify the stipulation and in his argument before the panel, respondent simply stated that the motion was based on information acquired later and ought to be granted to avoid unjust enrichment by McBurney.

Thus, in light of our raise or waive rule, we are satisfied this argument is not properly before this Court. *See State v. Pineda*, 712 A.2d 858, 861 (R.I.1998).

 Moreover, were this issue appropriately raised, we reject the suggestion that relief from an admission is governed by the same standard as relief from a consent order because the two are fundamentally different legal concepts. An admission is a one-sided occurrence that is "[a] voluntary acknowledgment of the existence of facts relevant to an adversary's case." Black's Law Dictionary, 48 (7th ed.1999). In contrast, a stipulation is a two-party agreement and is defined as "[a] voluntary agreement *between opposing parties* concerning some relevant point[.]" *Id.* at 1427. (Emphasis added.) Based upon these definitions, it is clear that the parties in this case executed a stipulation relative to an important fact in the controversy, thereby relieving both sides from the necessity of presenting evidence relative to that issue. Thus, the standard for relief from an admission should not be applied by this Court on review. Further, in light of our well-settled rule that an admission that has been conclusively established may be withdrawn only " '(1) if the admitting litigant has acted diligently; (2) if adherence to the admission might cause a suppression of the truth; and (3) if the withdrawal can be made without prejudice to the party who made the request[,]' " *Kelley v. K & H Realty Trust*, 717 A.2d 646, 648 (R.I.1998)(mem.) (quoting *General Electric Co. v. Paul Forsell & Son, Inc.*, 121 R.I. 19, 23, 394 A.2d 1101, 1103 (1978)), we are not persuaded that Kevin could meet the high standard necessary to withdraw an admission made in good faith. Finally, we are without an adequate record to properly review this issue because the panel failed to make findings of fact or set forth its reasons for granting the motion to modify the stipulation. We conclude, therefore, that the panel committed clear error when it modified the stipulation over the objection of petitioner.

Having determined that the stipulation was binding upon both parties, and conclusively established respondent's percentage ownership in McBurney, we need not address petitioner's second claimed error relative to an over-issuance of stock and the fair market value of that stock.

**Prejudgment Interest**

Turning to petitioner's next claim of error, McBurney argues that the panel erred when it awarded interest from the date that Kevin voluntarily terminated his relationship with McBurney. The petitioner maintains that by filing a petition with this Court seeking the appointment of a valuation panel, McBurney elected to purchase respondent's shares to avoid dissolution of the corporation and that interest should commence as of the date of the election to purchase. We note that Kevin objected to the appointment of the panel on the ground *inter alia*, that there was litigation pending against McBurney in which he was seeking "redress for unfair dealing, fraud, and breach of fiduciary obligations which require considerations and proof far beyond a mere appraisal of the value of [the corporate] stock[.]"

 It is well settled that prejudgment interest is available only where a statute, when strictly construed, expressly grants it. "Indeed, '[t]his [C]ourt has held that because the right to receive interest on judgments was unknown at common law as it is a right created by statute, the [C]ourt will strictly construe any statute that awards interest on judgments so as not to extend unduly the changes enacted

by the [L]egislature.' "[5] *DiLuglio*, 755 A.2d at 775. Further, we have previously held that " '[b]ecause we are strictly construing the statute [awarding prejudgment interest], we should avoid reading anything into the statute by implication.' " *Id.* Significantly, neither § 7–5.1–5, nor Rule 10(g), expressly provides for the award of prejudgment interest on the valuation reached by the panel. Unfortunately, in the decision before us the panel simply awards "statutory interest at the rate of twelve percent (12%) commencing July 29, 1993[,]" and fails to reference any statutory authority or set forth its reasons for doing so. The respondent argues that G.L.1956 § 7–1.1–90.1, entitled "Avoidance of dissolution by stock buyout," applies by analogy to the facts of this case to allow for interest to be added to the purchase price of his shares. Rhode Island's Professional Service Corporations Act, § 7–5.1–1, references chapter 1.1 of title 7 and provides that the Rhode Island Business Corporations Act shall apply to professional business corporations. Thus, in cases in which the corporation seeks to avoid a dissolution and elects to purchase the shares of the excluded shareholder, § 7–1.1–90 sets forth a procedure for the valuation and sale of the shareholder's shares, including a bond to guarantee payment. In those situations, the statute provides that the shareholder "is entitled to interest, at the rate on judgments in civil actions, on the purchase price of the shares from the date of the filing of the election to purchase the shares * * *." Section 7–1.1–90. As we noted in *DiLuglio*, "[t]his language is unambiguous," and sets the time for interest on the purchase price of the shares from the date of the election to purchase the shares. *DiLuglio*, 755 A.2d at 777. Thus, the tribunal is without discretion or equitable authority to set a different commencement date. *Id.* at 777–78. Therefore, according to § 7–1.1–90, interest does not begin to run unless and until there is an election to purchase the shares. Clearly, there is no evidence in this case that McBurney elected to purchase respondent's shares on the valuation date as established by the panel, nor are we convinced that this is the appropriate starting date for interest to begin. We are satisfied, however, that by filing a petition with this Court seeking the appointment of a valuation panel, McBurney formally elected to purchase respondent's shares. Clearly, the purpose of a valuation panel is to establish the value of the ineligible shareholder's interest in the corporation to redeem the shares or cause the shares to be purchased by an eligible person to avoid dissolution of the corporation. Accordingly, we are of the opinion that this is the appropriate date for interest on the purchase price to begin. Therefore, that portion of the decision of the panel ordering interest to begin on the valuation date is quashed and we direct that interest shall accrue from the date that the Rule 10 petition was filed with this Court.

### Authority of Panel

 Finally, noting that various civil actions remained pending between the

---

**5.** This Court has consistently held that we will strictly construe statutes that provide for the award of interest, that we will not extend the reach of these statutes; nor will we read anything into a prejudgment interest statute by implication. *See DiLuglio v. Providence Auto Body, Inc.*, 755 A.2d 757, 775 (R.I.2000); *Clark–Fitzpatrick, Inc./Franki Foundation Co. v. Gill*, 652 A.2d 440, 451–52 (R.I.1994). Thus, although the dissent recognizes that no provision for the award of interest is made by statute or Rule 10(g)(4) except as provided in G.L.1956 § 7–1.1–90, we disagree with the dissent's conclusion that Rule 10(g)(4) "implicitly includes such [an interest] component," that is analogous to arbitration awards. We decline to deviate from our numerous prior holdings and refuse to read an interest component into a statute or a rule where one does not exist.

parties in the Superior Court, the panel declared that it "has made no findings or determinations or conclusions which affect those cases." The petitioner asserts that the panel had no authority to decide the issue of collateral estoppel or *res judicata* as it related to its factual findings. We agree. A panel appointed by the Supreme Court pursuant to Rule 10(g) has a limited responsibility—to determine the fair market value of shares held by an ineligible shareholder in a professional service corporation—and has no authority to make rulings of law. The question of whether the parties to this controversy are precluded from re-litigating issues determined by the panel is a question of law and is to be governed by this Court's well-established principles of *res judicata* or collateral estoppel. Accordingly, that portion of the decision that addresses the question of *res judicata* or collateral estoppel is quashed.

### Conclusion

In conclusion, this is a case of first impression under Rule 10(g) of the Supreme Court Rules. Moreover, the parties to this unfortunate controversy are family members who were long engaged in the practice of law. We recognize that the issues raised by the parties and the testimony presented to the panel were difficult, confusing and sometimes painful. We acknowledge the significant time and effort expended by the panel members and their admirable performance. Clearly, the valuation decision of the panel is final and binding upon the parties and the critical work performed by the panel has not been challenged. This Court has passed upon alleged errors of law.

The petition for certiorari is granted, the decision of the panel vacating the stipulation of the parties is quashed. We direct that the respondent's percentage interest shall be determined in accordance

with the stipulation of the parties. Further, we quash and vacate that portion of the panel's decision setting the commencement date for prejudgment interest and direct that interest shall commence as of January 13, 2000, the date the petition for appointment of the valuation panel was filed with this Court. Having reinstated the stipulation of the parties, we have not reached the issue regarding the number of shares lawfully issued by the corporation. Finally, we quash that portion of the decision that purportedly decided the issue of collateral estoppel and *res judicata*.

FLANDERS, Justice, dissenting in part and concurring in part.

I respectfully dissent from the Court's opinion with respect to (1) the propriety of the valuation panel's decision to vacate the stipulation, and (2) the date when interest should begin to accrue on the value of the withdrawing attorney's stock ownership. I would deny certiorari and affirm the panel's decision in all respects (except for its assertion that it made no findings, determinations, or conclusions that affect other pending litigation between the parties). I would do so because I believe that the panel possessed the authority to vacate the parties' stipulation concerning Kevin McBurney's (lawyer) percentage of stock ownership in the professional service corporation of McBurney Legal Services (MLS or law firm), that it did not abuse its discretion in doing so, and that it properly applied interest to the valuation award from the date of the lawyer's ineligibility to continue as a shareholder in the law firm.

Like admissions, a stipulation of fact is neither conclusive upon the parties nor irrevocable by the fact-finding tribunal—especially when, as here, the evidence shows that its enforcement would not be conducive to the interests of truth or jus-

tice. As the valuation panel must have concluded, enforcing the stipulation in this case would not reflect the lawyer's true percentage of stock ownership in the law firm because it would be contrary to what the law firm's own tax returns showed as the lawyer's ownership share in the firm when he withdrew as a shareholder.

I also do not agree that the law firm elected to purchase the lawyer's shares under G.L.1956 § 7–1.1–90.1 when it petitioned this Court to appoint a panel to value his shares some seven years after he became ineligible to continue as an MLS shareholder. In my opinion, the election-to-purchase-shares statute was inapplicable to this situation because MLS never "elected" to purchase the shares; on the contrary, it was required by law to do so if it failed to cause another eligible shareholder to buy the lawyer's shares or to reach an agreement with the lawyer (within three months of his ineligibility) on the value of his shares in the professional services corporation. *See* Article II, Rule 10(g) of the Supreme Court Rules ("*If a shareholder dies or becomes ineligible, the professional services corporation shall: (1) Redeem the shareholder's shares* unless prohibited by law from accomplishing such redemption, *or (2) Cause the shareholder's shares to be purchased* by an eligible person or persons * * *.") (Emphases added.)

Moreover, the failure of the lawyer to transfer his shares to an eligible person or to offer them to the law firm cannot have prevented the law firm from proceeding under Rule 10(g). McBurney could not have transferred his shares to an eligible shareholder or to the law firm without their consent or without a court order requiring such a procedure. In contrast, the law firm—if it could not cause another eligible shareholder to purchase the stock or if it could not reach an agreement with

the lawyer on a buyout price within three months of the lawyer's departure—was required by law under Rule 10(g) to redeem McBurney's shares upon obtaining a fair-market value for his stock—even without his consent and even without any willingness on his part to offer his shares to the law firm for that purpose. Thus, the law firm always held the trump card here because, upon the expiration of the three-month period to reach an agreement with the lawyer, it alone could redeem McBurney's stock unilaterally—with or without his cooperation—once the valuation panel ascertained the fair-market value of the stock.

Thus, I believe that the appropriate date to begin the calculation of interest on the valuation award was the date of McBurney's ineligibility in 1993. After all, this is the date that must be used to value the stock. Rule 10(g)(4) provides that if the professional services corporation is unable to cause another eligible shareholder to purchase the withdrawing lawyer's stock, it shall redeem the shares itself by paying to the lawyer the stock's fair-market value as of the date of the withdrawing shareholder's ineligibility. If the law firm is unable to reach an agreement on the valuation of the withdrawing shareholder's stock (as of the date of his or her ineligibility) within three months from the date thereof, then the corporation must apply to this Court for the appointment of a panel of lawyers to value the stock. *Id.* In this case, the law firm failed to do so in a timely manner, causing a seven-year delay in the valuation proceedings. Instead of punishing the lawyer by providing him with a time-depreciated award for the value of his stock in the law firm, and instead of rewarding the law firm for its inexcusable delay in applying to this Court for the appointment of a valuation panel, I would award interest on the valuation of the lawyer's stock in the firm from the date of the

lawyer's ineligibility, thereby enforcing this Court's own rules and providing incentives for the parties to settle these disputes quickly and equitably.

## Standard of Review

This case comes to us on a petition for certiorari, and our standard of review in such cases is a limited one: "examining the record to determine if an error of law has been committed." *City of Providence v. S & J 351, Inc.*, 693 A.2d 665, 667 (R.I.1997) (quoting *Matter of Falstaff Brewing Corp. Re: Narragansett Brewery Fire*, 637 A.2d 1047, 1049 (R.I.1994)). "We do not weigh the evidence presented below, but rather inspect the record to determine if any legally competent evidence exists therein to support the findings made by the trial justice." *Id. See also Gregson v. Packings & Insulations Corp.*, 708 A.2d 533, 535 (R.I.1998).

## I

## Vacating the Stipulation

Before the hearing began, the parties stipulated that McBurney held a 25 percent ownership interest in the law firm. But before the panel began to receive evidence on the value of his stock, McBurney learned that the law firm had represented otherwise on its most recent tax returns. Indeed, the evidence presented to the panel showed that from 1987 to 1993 the law firm consistently stated on its tax returns that McBurney held a one-third ownership interest in the firm. McBurney had stipulated to the 25 percent figure because, at that time, the only evidence of his stock ownership that he knew about consisted of a copy of his share certificate for twenty-five shares and an affidavit from John McBurney, Jr., the law firm's founder, stating that the purpose of forming MLS was to benefit his four children, each of whom at one time or another had practiced

law at the firm. McBurney and the panel, however, eventually learned that MLS never issued 25 shares of its 100 authorized shares to one of the four children (Mark), who had long ceased practicing at the firm when McBurney withdrew in 1993. Consequently, at McBurney's request, the panel relieved the parties from the erroneous stipulation and ultimately found that McBurney, as the law firm itself had admitted in its tax returns, truly owned one-third of the shares in the firm.

A stipulation of fact such as the one the panel vacated in this case is not conclusively binding upon the parties, nor is it otherwise irrevocable. As long ago as 1894, this Court recognized that fact-finding tribunals, in their discretion, can set aside stipulations of fact under the proper circumstances. *See Wilbur v. Wilbur*, 18 R.I. 654, 656, 30 A. 455, 456 (1894) (holding that a party "could have moved before the trial to set it [the stipulation] aside as having been made through mistake, we think that on proof of the mistake the court might properly have granted the motion"). Moreover, numerous other jurisdictions have held that courts may set aside stipulations of fact because of a mistake, or upon a showing that other equitable circumstances warrant such relief in the interests of justice.

Indeed, the general rule is that courts and other fact-finding tribunals "have broad discretion in determining whether to hold a party to a stipulation, and may set aside a stipulation where enforcement would not be conducive to justice." 73 Am.Jur.2d *Stipulations* § 12 (2001). For example, the Supreme Judicial Court of Maine has held that "[a] stipulation should be adhered to unless it becomes apparent that it may inflict a manifest injustice upon one of the contracting parties or where it becomes evident that 'the agreement was made under a clear mistake.' " *M.P. As-*

sociates v. Liberty, 771 A.2d 1040, 1049 (Me.2001) (quoting *T I Federal Credit Union v. DelBonis*, 72 F.3d 921, 928 (1st Cir.1995)). *See also Sparaco v. Tenney*, 175 Conn. 436, 399 A.2d 1261 (1978) (holding that courts may set aside stipulations if they are the product of fraud, duress, or mistake), and *Henry F. Michell Co. v. Fitzgerald*, 353 Mass. 318, 231 N.E.2d 373 (1967) (holding that courts may set aside stipulations if not conducive to justice). A party, however, may not simply unilaterally withdraw from the stipulation or refuse to abide by its terms. The appropriate course of action is for the party to move the fact-finding tribunal to release it from the stipulation, citing the equitable grounds for doing so. *Sinicropi v. Milone*, 915 F.2d 66, 69 (2d Cir.1990); [6] *see also* 73 Am.Jur.2d *Stipulations* § 12.

Thus, it is settled that fact-finding tribunals, such as the panel of attorneys we appointed per Rule 10(g) to value McBurney's shares in the MLS law firm, possess the inherent authority to release a party from a factual stipulation. But what criteria should they apply to determine whether to vacate the stipulation? I would adopt the test used for relieving a party from admissions under Rule 36 of the Superior Court Rules of Civil Procedure. Stipulations, like admissions, facilitate the orderly resolution of disputes by relieving the parties of the burden of proving issues that are undisputed. Generally, courts will treat stipulations and admissions as binding; otherwise, they would no longer serve as a tool to streamline litigation. *Cardi Corp. v. State*, 524 A.2d 1092 (R.I. 1987). This Court, however, has held that admissions are not irrevocable and that "an admission may be withdrawn if the admitting litigant acted diligently; if adherence to the admission must cause a suppression of the truth; and if the withdrawal can be made without prejudice to the [opposing] party * * *." *Id.* at 1095 (quoting *General Electric Co. v. Paul Forsell & Son, Inc.*, 121 R.I. 19, 23, 394 A.2d 1101, 1103 (1978)). I believe that *nisi prius* tribunals, such as the panel in this case, should apply this same test when faced with a request to grant relief from a stipulation.[7]

Here, the parties entered into a stipulation of fact before the panel's hearing be-

**6.** *See also* 18 Wright, Miller & Cooper, Federal Practice and Procedure: *Jurisdiction* § 4443 at 382, 383 (1981), stating that a "[s]tipulation of individual issues * * * can be vacated according to basically contractual principles of fraud, ignorance, mistake, or mutual breach."

**7.** On the other hand, I do not believe that the test for obtaining relief from stipulations should be the same as the one for obtaining relief from judgments or consent decrees. *See, e.g., City of Providence v. The Employee Retirement Board of Providence*, 749 A.2d 1088 (R.I.2000). Although this Court has acknowledged that it is possible for a court to release a party from a consent judgment if the moving party can demonstrate fraud, mutual mistake, or actual absence of consent on the part of the negotiating parties, *Mansolillo v. Employee Retirement Board of Providence*, 668 A.2d 313, 316 (R.I.1995), parties should be able to obtain a release from stipulations of fact more readily than from consent judgments. A court enters a consent judgment as a final judgment in a case, and the consent judgment precludes the parties from relitigating the issues addressed in the judgment. Allowing parties to petition for release from such judgments on the same basis as stipulations would hamper the orderly administration of justice and compromise the finality of the judgments themselves. *See City of Providence*, 749 A.2d at 1093–94. But I would not afford stipulations, especially factually erroneous stipulations such as the one at issue here, the same level of deference as consent judgments because a request for relief from a stipulated fact occurs, as here, before any final judgment has entered; thus, it does not implicate concerns about respecting the finality of judgments that obtain whenever a party seeks to vacate a consent decree.

gan, agreeing that McBurney was a 25 percent owner of the corporation, rather than a one-third owner. But when, after examining the law firm's tax returns, McBurney's attorney discovered, before the panel began to receive evidence, that this stipulation was incorrect as a factual matter (the law firm's tax returns from 1987 to 1993 showed him to be a one-third owner), he took appropriate action by moving the panel to release his client from the stipulation on the grounds of a mistake of fact. McBurney's counsel presented the panel with information about why he had erred in mistakenly stipulating that McBurney owned only 25 percent of the corporation, rather than the full one-third he in fact owned as shown in the law firm's tax returns.

Moreover, the panel's decision to release McBurney from the erroneous stipulation did not unduly prejudice MLS because it too had relied for many years on its own tax returns showing the lawyer to be a one-third owner of the law firm. The motion for relief occurred before the panel had begun to receive any evidence. No delay resulted, no continuance was sought, and no prejudice to MLS was argued. MLS did not have to retain additional experts or take further discovery. Although it did not articulate its rationale, the panel apparently accepted these circumstances as sufficient to support its decision to set aside the stipulation. As I have noted above, the purpose of this Court's review on certiorari is not to determine whether the panel was correct in its discretionary determinations; nor can we reverse a discretionary ruling just because we might have decided these factual questions differently. Rather, our review "is restricted to an examination of the record to determine whether any competent evidence supports

the decision and whether the decision maker made any errors of law in that ruling," and whether the decision was "patently 'arbitrary, discriminatory, or unfair.' " *Asadoorian v. Warwick School Committee,* 691 A.2d 573, 577 (R.I.1997) (citing and quoting *D'Ambra v. North Providence School Committee,* 601 A.2d 1370, 1374, 1375 (R.I.1992)). Because I believe that the record contains competent evidence to support the panel's decision to relieve McBurney from the erroneous stipulation concerning his percentage of ownership in the MLS law firm, I would have affirmed the panel's discretionary ruling that vacated this stipulation, gave effect to the ownership share that the law firm itself had admitted was correct, and thereby elevated substance and truth over form and fallacy.

## II

### Interest Calculation

The Court also holds that the panel should not have awarded interest on the valuation award from McBurney's ineligibility date in 1993.[8] Rather, it believes that we should treat the law firm's application to this Court for the naming of a valuation panel for McBurney's shares as an "election to purchase shares," governed by § 7–1.1–90.1, the election-to-purchase statute. As a result, interest on the panel's valuation award did not begin to accrue until MLS "elected" to purchase Kevin McBurney's shares by requesting appointment of a valuation panel some *seven* years after he became ineligible. The election-to-purchase statute, however, is not properly applicable to this proceeding because the law firm has never "elected" to purchase McBurney's shares. On the contrary, it was required by law to do

---

**8.** It should be noted that the parties agreed that 12 percent would be the correct rate of interest to use if the panel awarded any interest on the valuation of McBurney's shares.

so upon McBurney's ineligibility in 1993 and upon its inability to cause another eligible shareholder to do so. *See* Rule 10(g). The only issue for the panel to decide was how much the law firm would be required to pay to McBurney for the fair-market value of his shares when he became ineligible, but it was impossible for the law firm to "elect" to purchase his shares in these circumstances.

Here, MLS's own failure to apply to this Court for the appointment of a valuation panel—after it failed to reach a buy-out agreement with McBurney within the three-month period that our rules allowed for the parties to negotiate an agreed-upon redemption price—delayed the resolution of "how much" the law firm owed to McBurney. *See* Rule 10(g)(4) ("[i]f no agreement is reached within such three (3) month period, the corporation shall apply to this court for appointment of three (3) qualified persons").[9] In fact, this Court recently disavowed the use of § 7-1.1–90.1 to calculate interest in a stock-purchase situation when, as here, the proceedings themselves were unduly protracted. *See Hendrick v. Hendrick,* 755 A.2d 784, 795 n. 11 (R.I.2000) (stating that "[w]e are mindful that § 7–1.1–90.1 provides for statutory interest on the share purchase price to accrue 'from the date of the filing of the election to purchase the shares * * *.'" Given the protracted nature of the proceedings before us, however,

and pursuant to our inherent power to fashion a fair and conclusive remedy, *Cheetham v. Cheetham,* 121 R.I. 337, 342, 397 A.2d 1331, 1334 (1979), we believe that the date of the initial demand for ECC's dissolution serves as the most appropriate historical event in these proceedings for the commencement of the accrual of statutory interest."). In this case, McBurney's withdrawal from the firm was tantamount to the initial demand for dissolution in *Hendrick* because, absent a lawful purchase of McBurney's shares within nine months from the date of his ineligibility, the firm should have dissolved and liquidated after his withdrawal. *See* Rule 10(g)(3) (providing that if neither the corporation nor an eligible shareholder purchases the ineligible lawyer's stock in the law firm "within nine (9) months from the date that the ineligibility occurred, then the corporation's license to practice shall be terminated forthwith and the [remaining] shareholders shall promptly take all steps necessary to cause the dissolution and liquidation of the corporation"). Thus, I disagree with the majority's methodology for calculating the interest that MLS owes to McBurney, and I would have affirmed the panel's award of interest from the date of his ineligibility to continue as a shareholder in 1993.

Although Rule 10(g)(4) is silent on whether the appointed valuation panel can award interest on valuations of an ineligi-

**9.** Although G.L.1956 § 7–5.1–5 initially allows either the ineligible shareholder or the professional services corporation to apply to this Court for the appointment of a valuation board, our own Article II, Rule 10(g), of the Supreme Court Rules is more specific: once three months have expired from the date of the lawyer's ineligibility to continue as a shareholder without the law firm reaching any agreement with the withdrawing shareholder on the price to be paid for the withdrawing shareholder's stock, Rule 10(g) places the onus of applying for appointment

of the valuation board solely on the professional services corporation. Because our rules specifically address lawyers who practice in a professional service corporation and because these rules "supersede any statutory regulation in conflict therewith," G.L.1956 § 8–6–2(a), I would hold that Rule 10(g) supersedes § 7–5.1–5 with regard to who is required to apply for appointment of the valuation panel if the parties fail to agree on a value for the withdrawing shareholder's stock within three months from the date of ineligibility.

ble shareholder's stock in a professional services corporation, I believe that if the withdrawing shareholder truly is to obtain a fair-market value for his or her shares, the panel's duty to determine "the fair market value" of the stock as of the date of ineligibility implicitly includes such a component. Otherwise, the law firm could delay purchasing the shares indefinitely by waiting to seek the appointment of a valuation board, thereby, as here, driving down the fair-market value of the amount payable to the ineligible shareholder merely by the law firm's taking advantage of the depreciating time value of the unpaid money due for the withdrawing shareholder's stock.

I also believe that arbitration awards provide the most appropriate analogue for this type of situation. Our rules required that a panel of lawyers act as arbitrators to determine the fair-market value of the withdrawing shareholder's stock as of the date of that shareholder's withdrawal. Numerous cases from this Court allow arbitrators to award prejudgment interest to the prevailing party, provided only that the parties have not expressly prohibited the arbitrators from doing so. *See, e.g., Paola v. Commercial Union Assurance Companies,* 461 A.2d 935, 937 (R.I.1983). Moreover, this Court repeatedly has held that, when the parties request an arbitrator to determine the amount that one party owes to the other, without a specific mention of interest, then the arbitrator possesses the authority to award interest. *See Sentry Insurance Co. v. Grenga,* 556 A.2d 998, 1000 (R.I.1989). In addition, we recently held that "the law in this jurisdiction [is] that prejudgment interest * * * may be awarded when an arbitrator is asked to determine only the amount that a plaintiff is entitled to recover * * *." *Murino v. Progressive Northern Insurance Co.,* 785 A.2d 557, 560 (R.I.2001) (citing

*Allstate Insurance Co. v. Lombardi,* 773 A.2d 864, 870 n. 2 (R.I.2001)).

I believe that these arbitration situations are more analogous to the decision of the valuation panel in this case than is a corporation's election to purchase shares. Both the lawyer and the law firm chose to practice law as a professional service corporation knowing that the applicable rules required a panel appointed by this Court to value a withdrawing shareholder's stock as of his or her date of ineligibility to continue as a shareholder, if the parties could not agree thereon. The rules also required the corporation (or another eligible shareholder) to buy that stock for its fair-market value within three months of the withdrawing shareholder's date of ineligibility. Furthermore, we have stated that the purpose of granting prejudgment interest is to encourage the prompt and reasonable settlement of disputes. *See, e.g., Merrill v. Trenn,* 706 A.2d 1305, 1311 (R.I.1998) (noting that "encourag[ing] early settlement of claims—[is] the overriding goal of our prejudgment-interest statute * * *"). For these reasons, I believe the best resolution of this case would be to read Rule 10(g) and the above-cited arbitration cases *in pari materia.* The purpose of Rule 10(g)'s relatively short time deadlines is clear: to insure prompt payment by the law firm of whatever money may be due and owing to the ineligible shareholder. But, as the record reflects, MLS made no attempt to comply with Rule 10(g)(4)'s requirement by applying for the appointment of a valuation panel in sufficient time so that, within six months after McBurney's ineligibility, the panel could report its valuation decision to this Court. Instead, MLS waited *seven years* to apply for the appointment of the valuation panel. Under these circumstances, the withdrawing attorney should not have to bear the brunt of MLS's flouting of the applicable rules, and, as we would in an

arbitration context, we should uphold the panel's decision to award interest on its valuation decision, starting from the date of the lawyer's ineligibility.

In *Skaling v. Aetna Insurance Co.*, 742 A.2d 282, 292 (R.I.1999), we stated that "[w]e have recognized that the purpose of statutes that award prejudgment interest is the encouragement of early settlement of claims." Rule 10(g)(4)'s strict time line for the valuation of shares in professional service corporations evinces that same public policy. I fear that the majority's decision in this case undermines that sound policy, and in fact will encourage intentional and careless delays in resolving disputes between law firms and withdrawing shareholders because law firms organized as professional service corporations in similar circumstances will have every incentive to avoid reaching any valuation agreement with the withdrawing attorney and to delay applying to this Court for the initiation of the valuation process. For all of these reasons, I would have held that the panel properly awarded McBurney interest dating to 1993.

## Conclusion

I would deny certiorari and affirm the panel's decision in all respects, except that I concur with the majority's decision to grant certiorari and to vacate that portion of the panel's decision that purported to limit the issue-preclusion effects of its decision. I agree that this portion of the panel's ruling was beyond its authority.