**Supreme Court**

No. 2011-139-Appeal.
No. 2010-433-Appeal.
(P06-1525)

Hope Billings McCulloch          :

v.          :

James Robert McCulloch.          :

NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2011-139-Appeal.
No. 2010-433-Appeal.
(P06-1525)

Hope Billings McCulloch          :

v.                               :

James Robert McCulloch.          :


Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

# O P I N I O N

**Justice Flaherty, for the Court.**  After a protracted, if not epic, battle in the Family Court, the plaintiff, Hope Billings McCulloch (Hope), appeals from a decision that granted her complaint and the counterclaim of the defendant, James Robert McCulloch (James), for an absolute divorce.[1]  At the heart of this matter is the distribution of the stock of Microfibres, Inc. (Microfibres), a manufacturer of fabric—of which James is the president and chief executive officer—and Microfibres Partnership Limited (MPL), an affiliated company that owns certain equipment and real estate in North Carolina.

On appeal, Hope argues that the trial justice erred: (1) in his determination of the percentage of MPL that was marital property; (2) by declining to place a value on Microfibres before he divided the marital estate; (3) by disregarding a consent order that set forth the date as of which the marital property was to be valued; (4) by assigning Hope 25 percent of Microfibres, thereby rendering her a minority shareholder in a closely held corporation; (5) by declining to award Hope alimony; (6) by awarding Hope only $1,000 per week in child support; (7) by

---

[1] In this case, we refer to the parties as Hope and James.  This is for the purpose of clarity only, and we intend no disrespect by using their first names.

- 1 -

declining to award Hope fees for her attorneys, experts, and the supervisor of James's visits with their son Lucas James McCulloch (Lucas); and (8) by declining to order the disclosure of certain documents and information concerning James's will, trusts, and estate plans. Conversely, in a protective and conditional cross-appeal, James argues that the trial justice erred when he held that Microfibres was a marital asset and not an advance on his inheritance. For the reasons set forth in this opinion, we affirm in part and vacate in part the Family Court's decision pending entry of final judgment, and we remand the matter to that tribunal for further proceedings consistent with this opinion.

## I

## Background

Hope and James were married on February 14, 1989. They separated in the early part of 2005, and on June 16, 2006, Hope filed a complaint for an absolute divorce. James filed an answer and counterclaim on May 7, 2007. As grounds for divorce, both parties cited irreconcilable differences which caused the irremediable breakdown of the marriage. The parties have two children, Bay Billings McCulloch, who is no longer a minor, and Lucas, who reached the age of nineteen on June 18, 2013.

## A

## Proceedings Below

There were extensive proceedings in the Family Court that spanned almost five years, producing a veritable mountain of documents and transcripts. For the sake of brevity, we will recount only the portions of the record that are relevant to this appeal, and we will provide additional facts in our discussion where necessary.

It is significant that on October 17, 2008, during the course of the divorce proceedings, the parties entered into a consent order that embodied various agreements and stipulations that they previously had made. The pertinent provisions of that consent order read as follows:

> "31.   Neither party shall challenge: a) the date of valuation of any appraisal of real estate, equipment, machinery or the parties' possessions by any expert after October 1, 2007, or b) the date of the valuation of Microfibres, Inc. by any expert after October 1, 2007.

> "32.   For purposes of the rule that marital assets should be valued as of the date of trial unless there are compelling circumstances warranting a deviation, and by agreement of the parties, the dates of appraisals and valuation referenced in paragraph 31 above shall be considered as if they were appraised on the date of trial.

> "33.   Nothing in paragraphs 31 or 32 above shall impair or prejudice the rights of either party to challenge any valuation or appraisal on the merits, other than based on: 1) the date of the valuation or appraisal, or 2) any change in circumstances surrounding the valued assets from February to May 27, 2008, unless such change of circumstances is determined by the trial justice to be an extraordinary change in circumstances that could not have been contemplated by the parties, provided, however, that the party in possession of any asset shall not claim, contend or urge that any such extraordinary change of circumstances shall have occurred with respect to any such asset unless he or she has disclosed such change of circumstances promptly and in no event more than three business days after the change in circumstance having occurred."

At trial, the court heard testimony from Mary Ann Beirne, the chief financial officer of Microfibres. She testified about the company's plan to purchase a controlling interest in a printing and dyeing company in China (the China venture). Ms. Beirne further testified that if the China venture were to fall through, it would be devastating for Microfibres. James also testified that Microfibres had been losing money each year and that the success of the China venture was vital to the survival of the company.

Three experts testified about the value of Microfibres and MPL. Peri Ann Aptaker, a certified public accountant (CPA), testified on behalf of Hope; John Brough, Jr., CPA, testified on behalf of James; and Jay Fishman, a neutral, court-appointed expert engaged to assist the trial justice regarding the valuation of the two business entities, also testified. Aptaker was called upon first. She testified that she prepared a report embodying her opinion that the fair market value of Microfibres, as of December 31, 2007 was $126,365,000.[2] However, she also testified that she "couldn't place [a] value o[n] the China investment,"—which was initiated after December 31, 2007—because she had no data available to her that she could use to predict what impact, if any, that that venture might have on Microfibres. Aptaker was later recalled to testify at a time when she had more information available to her about the China venture; however, even in this later testimony, she said that she had not completed an updated valuation of the company and that the numbers she had reviewed with regard to the China venture were merely estimates. Therefore, she remained unable to "provide an opinion of value with respect to the China venture." Finally, she testified that one must take into account the state of the economy when valuing a company. In fact, the trial justice took judicial notice of the worldwide economic crisis that had occurred since the valuation date to which the parties had agreed.

John Brough, Jr., James's expert, then testified. He opined that a $126 million value for Microfibres was not justified. Rather, his analysis led him to believe that the company had a value of $106 million. Similar to Aptaker, he testified that when valuing the company he "had no available information about the [China venture] because the deal was not closed" as of December 31, 2007.

---

[2] Although the consent order provided that the valuation date was to be October 1, 2007, throughout the record and in the parties' briefs, the trial justice and the parties refer to the valuation date as December 31, 2007. After a thorough review of the record, this Court is unaware of when, or even if, the valuation date was formally changed to December 31, 2007.

Finally, Jay Fishman, the court-appointed expert, testified. He said that "there ha[d] been a meltdown in the financial market since" the December 31, 2007 valuation date. He testified that "consumer spending [wa]s way off" and "millions of jobs ha[d] been lost. So the financial conditions of the * * * countries [Microfibres] would sell to and sell in * * * ha[d] changed dramatically." Additionally, he said, "[b]oth [parties'] experts received insufficient information and, therefore, I received insufficient information to place a value or an economic benefit on the China venture at [December 31, 2007]."

**B**

**Decision**

On August 17, 2010, the trial justice issued a lengthy written decision in which he granted an absolute divorce to both parties on the ground of "irreconcilable differences between the parties which have caused the irremediable breakdown of the marriage." He awarded the parties joint custody of Lucas, with primary physical placement with Hope and regular luncheons and other reasonable visitations with James.

The trial justice then addressed the equitable assignment of the marital property. First, he addressed the assets—with the exception of Microfibres and MPL—that the parties had stipulated were marital property. These assets included three homes and their contents, two vacant lots, two automobiles, three country club and golf club memberships, certain jewelry, and various bank accounts and investment accounts that totaled more than $16 million. Before distributing the property, the trial justice examined each factor set forth in G.L. 1956 § 15-5-16.1(a).[3]

---

[3] General Laws 1956 § 15-5-16.1(a), entitled "Assignment of property," provides:
      "In addition to or in lieu of an order to pay spousal support made pursuant to a complaint for divorce, the court may assign to either

The trial justice found that the parties had been married on February 14, 1989 and separated in April 2005, and that, despite some "aggravating" and "hurtful" conduct by both parties, neither one was at fault for the breakdown of the marriage. He then addressed "the contribution of each of the parties during the marriage [in] the acquisition, preservation or appreciation in value of their respective estates." He found that early in the marriage, Hope contributed to the couple's income from her "minimal employment" and her rental property; however, he then observed that:

> "It [wa]s clear and unequivocal that [James] was the primary source of the significant wealth that was accumulated during this marriage. It was [James]'s employment in the family business that made it possible for this family to develop the estate * * *. Likewise, it was [James] who managed the family's investment

the husband or wife a portion of the estate of the other. In determining the nature and value of the property, if any, to be assigned, the court after hearing the witnesses, if any, of each party shall consider the following:
    "(1) The length of the marriage;
    "(2) The conduct of the parties during the marriage;
    "(3) The contribution of each of the parties during the marriage in the acquisition, preservation, or appreciation in value of their respective estates;
    "(4) The contribution and services of either party as a homemaker;
    "(5) The health and age of the parties;
    "(6) The amount and sources of income of each of the parties;
    "(7) The occupation and employability of each of the parties;
    "(8) The opportunity of each party for future acquisition of capital assets and income;
    "(9) The contribution by one party to the education, training, licensure, business, or increased earning power of the other;
    "(10) The need of the custodial parent to occupy or own the marital residence and to use or own its household effects taking into account the best interests of the children of the marriage;
    "(11) Either party's wasteful dissipation of assets or any transfer or encumbrance of assets made in contemplation of divorce without fair consideration; and
    "(12) Any factor which the court shall expressly find to be just and proper."

- 6 -

accounts to the successful point that ha[d] been achieved, notwithstanding the difficult market."

The trial justice then considered "[t]he contribution and services of either party as a homemaker." He found that Hope "played the role primarily of homemaker," but that James "provided [her] with either a [n]anny, or household help, or both, in order to reduce the homemaker's responsibilities." Furthermore, James "did most of the family cooking when he was home" and "he contributed to the care of the children." Moving to the next statutory factor, the trial justice found that Hope was in "good health," but that James suffered from some physical or emotional malady and that he had had health issues with his back and his hip.

As to the next factor, he found that Hope derived income from personal investments, as well as from support provided by James; he also found that James's income consisted of his salary and distributions from Microfibres. Regarding the occupations and employability of the parties, the trial justice found that Hope had not been part of the work force for twenty years and that James was currently employed as the chief executive of Microfibres. He concluded that both parties would be in a position to acquire further assets and income, based on the substantial amount of assets that they currently owned. He also found that "[n]either party contributed materially to the education, training, or licensure of the other"; however, James "certainly ha[d] placed [Hope] in the position of increasing her earning power by reason of his contributions of assets to the marital estate to which she [wa]s a beneficiary."

The trial justice found that the tenth statutory factor—[t]he need of the custodial parent to occupy or own the marital residence—"[wa]s not material in this case" because there were two domiciles. Finally, he found that there was no wasteful dissipation of assets or any transfer or encumbrance of assets made in contemplation of divorce without fair consideration.

- 7 -

After reviewing each of the statutory factors, the trial justice awarded each party 50 percent of their bank and investment accounts and 50 percent of one of the country club memberships. He assigned Hope one home and its contents, both automobiles that were in her possession, and all the jewelry that was in her possession. He assigned James the remaining two homes and their contents, the two vacant lots, the remaining golf club membership and country club membership, as well as the jewelry that was in his possession.

The trial justice then addressed the knotty issue of the equitable distribution of Microfibres and MPL. Echoing his holding from April 28, 2008 on Hope's motion for partial summary judgment, the trial justice declared that the stock in Microfibres—all of which stood in James's name—was a marital asset. He also found that only 49.9967 percent of MPL was marital property, because the remainder had been either acquired by James before the marriage or had been gifted to him.[4] See § 15-5-16.1(b) ("The court may not assign property or an interest in property held in the name of one of the parties if the property was held by the party prior to the marriage[.] * * * The court shall not assign property * * * which has been transferred to one of the parties by gift * * *.").

After an extensive review of the expert testimony in the case, and relying on the October 17, 2008 consent order, the trial justice decided to order an in-kind distribution of the stock of Microfibres and an in-kind distribution of a partnership interest in MPL, instead of valuing the companies and assigning a portion of that value to each party. He found that he "d[id] not have before [him] any probative or credible evidence upon which to base a fair and reasonable valuation of the value of the stock in th[e] corporation," because "since [December 31, 2007], there ha[d], in fact, been an extraordinary change in circumstances that could not have been

_____

[4] Microfibres owned a 10 percent interest in MPL and, therefore, that portion was accounted for when the trial justice distributed Microfibres.

contemplated by the parties." The extraordinary change in circumstances included, the trial justice asserted, "structural changes in the world economy" caused by "a meltdown in the financial market." That economic crisis, coupled with the fact that "[t]he 'China Venture' had not been finalized," and the fact that "[n]one of the experts had given any detailed consideration to the potential impact of" that venture, led the trial justice to conclude that he was unable to accurately value Microfibres and MPL. For these reasons, the trial justice determined that "[t]he only fair and equitable method of assigning to [Hope] a portion of the corporate assets would be by assigning to her a portion of the corporate stock," instead of a sum in cash.

In deciding what percentage of that stock to award to Hope, the trial justice found that Hope

> "made little or no contribution to [Microfibres or MPL]. It was a family business in the family of [James] for multiple generations. * * * Notwithstanding th[e] finding [that Microfibres was a marital asset], [Hope] ha[d] in no significant way done anything to contribute towards the acquisition, preservation or appreciation of the corporate assets."

He found that "she may have done some decoration at [a] property owned by the corporation," but that "that essentially [wa]s the limit of her contribution." The trial justice "acknowledge[d] that she served as a homemaker and as such [wa]s entitled to a share of the marital assets which include[d] Microfibres." However, he held "that it would be completely inequitable for her to receive a portion of the share in Microfibres, Inc. equal to that of [James] whose blood, sweat and tears and contributions by his family ha[d] been the reason for both the past success and what hopefully w[ould] be the future success of this corporation." Based on these findings, and relying on the factors enumerated in § 15-5-16.1, the trial justice awarded Hope 25 percent of the stock in Microfibres and 25 percent of that portion of MPL that he had determined to be marital property. James received 75 percent of those two assets.

Next, the trial justice addressed the issue of alimony. He examined the statutory factors set forth in § 15-5-16 and reincorporated his previous findings from his equitable distribution analysis. He also emphasized the great wealth that the parties enjoyed and specifically found that "[t]he totality of [Hope]'s estate weighs heavily upon this [c]ourt in its determination as to whether or not alimony is justified in this case." Given Hope's assets and the language of § 15-5-16(c)(2)—which provides that "[a]limony is designed to provide support for a spouse for a reasonable length of time to enable the recipient to become financially independent and self-sufficient"—the trial justice denied her request for alimony.

The trial justice then addressed the issue of child support for Lucas. After considering the statutory factors enumerated in § 15-5-16.2, the child support guidelines set forth in Family Court Administrative Order 2007-07, and the evidence of the parties' incomes and Hope's expenses associated with raising Lucas, the trial justice ordered James to pay Hope $1,000 per week. He also ordered James to pay all expenses reasonably connected with Lucas's education, summer camp, vacations with James, and all medical and dental expenses.

Finally, the trial justice denied Hope's request for fees, citing to this Court's opinion in Thompson v. Thompson, 642 A.2d 1160 (R.I. 1994), in which we held that "before awarding counsel fees, the trial justice must determine that the party seeking the award is without funds or property available to pay the fees * * *." Id. at 1165 (quoting Stevenson v. Stevenson, 511 A.2d 961, 967 n.6 (R.I. 1986)). Because Hope was in possession of substantial assets, including those awarded to her in the equitable distribution of the marital estate, the trial justice denied her request for counsel, expert witness, and other fees. On October 1, 2010, Hope filed a notice of appeal, and on October 20, 2010, James filed a conditional and protective cross-appeal. The two appeals were consolidated by this Court.

## II

### Standard of Review

"[T]he trial justice is accorded broad discretion with respect to the equitable distribution of marital assets; consequently, we will not overturn the trial justice's distribution unless it is demonstrated that he or she has abused his or her discretion." Tondreault v. Tondreault, 966 A.2d 654, 659 (R.I. 2009) (quoting DeAngelis v. DeAngelis, 923 A.2d 1274, 1277 (R.I. 2007)). "As long as the trial justice did not overlook or misconceive relevant and material evidence, and as long as he or she considered the requisite statutory elements set forth in § 15-5-16.1, we will not disturb the trial justice's assignment of property." Tondreault, 966 A.2d at 659. Furthermore, it is well established that this Court will not disturb the trial justice's credibility determinations or findings "of fact in a divorce action 'unless he or she has misconceived the relevant evidence or was otherwise clearly wrong.'" Id. at 660 (quoting DeAngelis, 923 A.2d at 1277). "However, when this Court reviews questions of law in an appeal from the Family Court, 'we must apply a de novo review.'" Curry v. Curry, 987 A.2d 233, 238 (R.I. 2010) (quoting Schwab v. Schwab, 944 A.2d 156, 158 (R.I. 2008)).

"[A]lthough [a consent order] 'receives a court's imprimatur,' [it] is 'in essence a contract' and therefore must 'be construed as a contract * * *.'" Vanderheiden v. Marandola, 994 A.2d 74, 78 (R.I. 2010) (quoting Now Courier, LLC v. Better Carrier Corp., 965 A.2d 429, 435 (R.I. 2009)). "If a contract is clear and unambiguous, the meaning of its terms presents a question of law for the court[,]" which we review de novo. State Department of Environmental Management v. Administrative Adjudication Division, 60 A.3d 921, 924 (R.I. 2012) (quoting Rotelli v. Catanzaro, 686 A.2d 91, 94 (R.I. 1996)). "Likewise, this Court reviews issues of statutory interpretation de novo." Bucci v. Lehman Brothers Bank, FSB, No. 2010-146-A, 2013

- 11 -

WL 1498655, at *6 (R.I. April 12, 2013). "When a statute is clear and unambiguous we are bound to ascribe the plain and ordinary meaning of the words of the statute and our inquiry is at an end." Id. (quoting Town of Burrillville v. Pascoag Apartment Associates, LLC, 950 A.2d 435, 445 (R.I. 2008)).

Finally, "[a] trial justice's award of attorney's fees is subject to review for abuse of discretion." Kells v. Town of Lincoln, 874 A.2d 204, 214 (R.I. 2005) (quoting In re Estate of Cantore, 814 A.2d 331, 334 (R.I. 2003)). Similarly, "[w]e have consistently held that '[i]n granting or denying discovery motions, a [trial] justice has broad discretion,'" and "we will not disturb [his or her] decision relating to discovery 'save for an abuse of that discretion.'" Dawkins v. Siwicki, 22 A.3d 1142, 1150 (R.I. 2011) (quoting Travelers Insurance Co. v. Hindle, 748 A.2d 256, 259 (R.I. 2000)). However, "[t]his Court reviews the grant of a motion for summary judgment de novo." People's Credit Union v. Berube, 989 A.2d 91, 93 (R.I. 2010).

### III

### Discussion

In her appeal, Hope argues that the trial justice erred: (1) in his determination of the percentage of MPL that was marital property; (2) by declining to place a value on Microfibres before dividing the marital estate; (3) by disregarding the consent order that set forth the date as of which the marital property was to be valued; (4) by assigning Hope 25 percent of Microfibres, thereby making her a minority shareholder in a closely held corporation; (5) by declining to award Hope alimony; (6) by awarding Hope only $1,000 per week in child support; (7) by declining to award Hope fees for her attorneys, experts, and the supervisor of James's visits with Lucas; and (8) by declining to order the disclosure of certain documents and information

concerning James's will, trusts, and estate plans.  We shall address each of these arguments in turn.

## A

## Equitable Distribution

It is well settled that "[t]he equitable distribution of property in a divorce action involves three steps: (1) determining which assets are marital property; (2) considering the factors set forth in G.L. 1956 § 15-5-16.1(a); and (3) distributing the property." Tondreault, 966 A.2d at 662 (quoting DeAngelis, 923 A.2d at 1277).  With this established procedure in mind, we will first address Hope's argument about the percentage of MPL that should properly be considered to be marital property.

## 1

## The Percentage of MPL that is Marital Property

Hope presents a two-fold argument with respect to MPL: She contends that the trial justice did not make sufficient factual finding to support his determination that James acquired 20 percent of MPL before the marriage, and she also asserts that he erred when he found that 20.0033 percent of MPL was gifted to James by his father.[5]  James responds by arguing that the trial justice's findings were sufficient to support his ruling that the disputed portions of MPL either were acquired before the marriage or were gifted to him and, furthermore, that there is an adequate foundation in the record to support those findings.

---

[5] Hope also argues that the trial justice erred by not placing a value on MPL before distributing the marital assets; however, we shall address this argument together with her similar contention regarding the need to value Microfibres.

- 13 -

It is undisputed that 10 percent of MPL is owned by Microfibres, and James concedes that 49.9967 percent of MPL is marital property. Therefore, it is the remaining 40.0033 percent of the company that is at issue. In his decision, the trial justice found that:

> "The uncontradicted evidence shows that with respect to the partnership, MPL, a portion of [James]'s interest was gifted to him by his father. That portion was 20.0033%. The Court finds that that portion gifted to [James] is not assignable under Section 15-5-16.1, as it is not legally a marital asset. [Additionally, James] claims that 20% of MPL was owned by him prior to the marriage. The Court can certainly award as marital assets in accordance with the statute, any appreciation of the value of that 20% after the date of marriage. However, there is no such evidence to show appreciation of that prior 20%. [James] has stipulated that 49.9967% of MPL is a marital asset. Therefore, the Court will assign to [Hope] 25% of the 49.9967% of MPL, as it is clearly assignable under Section 15-5-16.1[.]"

From the above-quoted portion of the decision, it is clear to us that the trial justice concluded that James owned 20 percent of MPL before the marriage, and certainly the record supports this finding. On June 10, 2008, James testified that he had a 20 percent interest in MPL and that he acquired it prior to the marriage. Although the trial justice's finding with respect to that 20 percent interest was perhaps not as explicit as it could have been, it is clear from the context of the trial justice's remarks that he chose to accept James's testimony and that the 20 percent in dispute was owned by James prior to the marriage and, therefore, was not part of the marital estate. We hold that there was no error in this finding.

Additionally, the record contains three documents, labeled as deeds of gift, which, taken together, evidence a transfer of a 20.0033 percent interest in MPL from James's father, Norman E. McCulloch, Jr. (Norman), to James, without consideration. The record is devoid of anything that would belie that these transfers were gifts. See Ruffel v. Ruffel, 900 A.2d 1178, 1189 (R.I. 2006) ("The elements of a valid gift are a 'present true donative intent on the part of the donor,'

and 'some manifestation such as an actual or symbolic delivery of the subject of the gift so as to completely divest the donor of dominion and control of it.'" quoting Black v. Wiesner, 112 R.I. 261, 267, 308 A.2d 511, 515 (1973)).  Therefore, the trial justice did not err when he found that this 20.0033 percent interest in MPL was gifted to James by his father, and thus, it was not marital property.  Accordingly, we see no error in the trial justice's determination that the entire contested portion of MPL was not marital property.

**2**

**The Valuation of Microfibres and MPL**

Hope's next argument is that the trial justice abused his discretion when he assigned to her a percentage of Microfibres and MPL without first placing a value on those assets.  She contends that this was error because: (1) § 15-5-16.1 requires that a value be placed on all marital property, and (2) the trial justice could not have determined whether the distribution was equitable without first assigning a value to the property.   James counters by arguing that, in Rhode Island, a valuation of marital property prior to distribution is not required as a matter of law.

Section 15-5-16.1(a), entitled "Assignment of property", provides that:

> "In addition to or in lieu of an order to pay spousal support made pursuant to a complaint for divorce, the court may assign to either the husband or wife a portion of the estate of the other. In determining the nature and <u>value</u> of the property, if any, to be assigned, the court after hearing the witnesses, if any, of each party shall consider the following [twelve factors] * * *." (Emphasis added.)

Hope argues that the phrase "[i]n determining the nature and <u>value</u> of the property" creates a statutory obligation that requires a trial justice to measure the worth of all marital property before he or she assigns it. Id. (emphasis added).  However, in our opinion, this phrase does not create

such a command. This Court has never held that a trial justice is required to value all marital property before he or she distributes it.

Indeed, we have endorsed a trial justice's distribution of a marital estate in the absence of placing a value on some of the property. In Tondreault, 966 A.2d at 664, the trial justice "was unable * * * to specify the values of the[ IRA] accounts cited by the husband because they had not been provided by the parties." Nonetheless, this Court held that,

> "[g]iven their control over their respective records, it was reasonable to expect that the parties could, between themselves, determine these appreciation values. Furthermore, the exact values of each marital asset were of little consequence to the trial justice's decision because the trial justice distributed each marital asset by percentage to each party rather than by totaling the values of all assets and making an assignment based on the sum value of the marital estate." Id.

Therefore, we held that "[t]here was no error," and we affirmed the trial justice's distribution of the IRA accounts. Id.

To support her position, Hope cites Curry, 987 A.2d at 246-47, and Gervais v. Gervais, 735 A.2d 214, 214 (R.I. 1999) (mem.). However, these cases do not address the issue of whether a trial justice must value all the property in a marital estate; instead, they deal merely with the time as of which the marital property should be valued. Curry, 987 A.2d at 246 ("[M]arital assets should be valued as of the date of trial unless there are compelling circumstances warranting a deviation." quoting Gervais, 735 A.2d at 214); Gervais, 735 A.2d 214 (deciding whether "the trial justice erred in refusing to make additional findings of fact to support the valuation of the marital estate at a date other than the date of judgment" (emphasis added)). Therefore, we are not persuaded that we should adopt a bright-line, per se rule that would require a trial justice to place a value on all marital property before he or she distributes it.

Nonetheless, in this case, it is our opinion that there was an abuse of discretion when the trial justice declined to value Microfibres and MPL before assigning them. This is so, in part, because those assets constitute such an enormous portion of the marital estate. The experts engaged by the parties valued the companies as of December 31, 2007, at between $106 million and $126 million. Although the values of these companies may have fluctuated since that date, it cannot be gainsaid that Microfibres and MPL compose the vast majority of the marital estate.

More importantly, the trial justice's decision not to place a value on the specific portions of Microfibres and MPL that he assigned to the parties also constituted an abuse of discretion, because he assigned the parties unequal percentages, thereby rendering Hope a minority shareholder of a closely held corporation. Without knowing the values of the portions of the companies that he assigned to each party, we are unable to review whether the entire distribution was equitable.

We recognize, as did the trial justice, that an assignment of stock in a closely held corporation, which makes one spouse a minority shareholder, is generally disfavored and should be avoided whenever possible. See Robbins v. Robbins, 549 So. 2d 1033-34 (Fla. Dist. Ct. App. 1989) ("Such a financial arrangement is intolerable, * * * and places the spouse without any real control over the closely held corporation at a distinct disadvantage to the spouse who runs the business."); Josephson v. Josephson, 772 P.2d 1236, 1243 (Idaho Ct. App. 1989) (holding that a distribution of "stock in a closely held corporation, with majority control in one spouse and with virtually no public market for the stock * * * does little to completely separate the parties and their property"); Savage v. Savage, 658 P.2d 1201, 1205 (Utah 1983) ("[W]henever possible, continued joint ownership by divorced spouses of closely held corporate stock should be avoided

- 17 -

* * *."); see also Stephen W. Schlissel, The Hazards of "In-Kind" Distributions of Closely-Held Stock in Divorce Actions, 17 J. Am. Acad. Matrim. Law. 381 (2001).

Although we do not hold that it is always error to distribute the stock in a closely held corporation such that one spouse is rendered a minority shareholder, it was, in our opinion, error in this case not to value the ownership interests that were assigned to each party. Here, the trial justice assigned Hope 25 percent of Microfibres and MPL; however, a 25 percent, minority share of a closely held corporation will likely not be the equivalent of 25 percent of the total value of the company. First, this is true because stock in a closely held corporation, which is not publicly traded, lacks liquidity because there is no established public market for the stock. See 18A Am. Jur. 2d Corporations § 373 at 247 (2004). Second, a minority shareholder lacks control over the company, and therefore, the value of his or her stock is diluted in comparison to that of a majority shareholder. See id. at 248.

Although, this Court has "adopt[ed] the rule of not applying [a minority discount or] a discount for lack of marketability" in the context of an action for dissolution of a closely held corporation, we believe that such discounts are appropriate, and even necessary, when valuing an in-kind distribution of a minority share of a closely held corporation in a divorce action. DiLuglio v. Providence Auto Body, Inc., 755 A.2d 757, 774 (R.I. 2000) (quoting Charland v. Country View Golf Club, Inc., 588 A.2d 609, 613 (R.I. 1991)). The reason that these discounts are not applied "when a corporation elects to buy out a shareholder who has filed for dissolution" is that "[m]inority shareholders should not receive less than [fair market] value if, instead of fighting the dissolution action, the majority decides to * * * buy out the minority * * *." Charland, 588 A.2d at 613 (quoting Robert B. Heglar, Rejecting the Minority Discount, 1989 Duke L.J. 258, 269 n.63 (1989)). Thus, in those situations, the corporation itself is a willing

- 18 -

buyer, and the rule against applying a minority discount is imposed only to protect the minority shareholder who is bringing the action.

In this case, however, if the trial justice were to assign Hope an in-kind, minority share of Microfibres and MPL, Hope would be assigned illiquid assets that have no ready market, and she would be left with no control over the companies. Thus, both a minority discount and a marketability or illiquidity discount must be applied when valuing the portions of the companies that will be assigned to each party. However, if the trial justice had awarded Hope the cash equivalent of her equitable ownership interest in the companies, or if he had crafted some other assignment, such discounts would not be necessary. See Josephson, 772 P.2d at 1244 (holding that "such discounting will not be applicable here when the magistrate awards all shares to [one spouse] and orders compensation or an offsetting award of other property to [the other spouse]").

It is not lost on us that Microfibres and MPL comprise an enormous portion of the marital estate. In view of this fact, and because the trial justice assigned to Hope an in-kind, minority share of the two entities, it is our opinion that the trial justice was required to place a value on those companies. Moreover, he should have placed a value on the portions of the two entities that he assigned to each party to ensure that his distribution of the marital estate was truly equitable.

Finally, because we are satisfied that this case required these value determinations, we decline to address Hope's contention that an assignment of only 25 percent of Microfibres and MPL to her was inequitable and, thus, an abuse of discretion. Because we are unable to review

the value of the 25 percent assignment in comparison to the remainder of the marital estate, we are unable to determine whether this assignment to her was equitable.[6]

### 3

### The Consent Order

Hope also argues that the trial justice erred when he, sua sponte, disregarded the October 17, 2008 consent order, in which the parties had agreed to a valuation date for the marital property. James contends that the terms of the consent order permitted the trial justice to find that there was a change in circumstances that rendered the valuation date obsolete and that the trial justice correctly found that a change in circumstances had, in fact, occurred based on the experts' testimony concerning the worldwide economic crisis and the unknown value of the China venture.

Although Hope argues that the trial justice's decision to disregard the agreed-upon valuation date was sua sponte, this contention is not entirely accurate, despite the unconventional manner in which the trial justice made his decision, which we shall briefly recount. On April 9, 2009, James submitted his posttrial memorandum, in which he argued that, based on the experts' testimony, the trial justice could not reasonably place a value on Microfibres because of the "unforeseeable and dramatic downturn" in the worldwide economy that occurred after the

---

[6] Also, because we are unable to fully review the distribution of the marital estate, we decline to pass on Hope's arguments about alimony and child support at this time, because those analyses may depend on the trial justice's assignment of marital property on remand. See Marsocci v. Marsocci, 911 A.2d 690, 699-700 (R.I. 2006) (declining to reach the issue of child support until the trial justice performed a valuation and equitable distribution); Ruffel v. Ruffel, 900 A.2d 1178, 1193 (R.I. 2006) ("[T]he proper amount to award for alimony, if any, will depend on the ultimate distribution of the marital estate by the Family Court on remand * * *."). Furthermore, on June 18, 2013, Lucas turned nineteen years old, thus, in all likelihood, rendering any issue concerning child support moot. See § 15-5-16.2(b) ("The court may, if in its discretion it deems it necessary or advisable, order child support * * *, but in no case beyond [a child's] nineteenth (19th) birthday.").

valuation date contained in the consent order. Further, James argued in his posttrial memorandum "that the current economic crisis, or structural change in the world economy, [wa]s an extraordinary circumstance that was not anticipated by the parties." Thus, James argued that the "arbitrary valuation date" contained in the consent order should no longer be utilized by the parties. Some four months later, on August 7, 2009, while the trial justice was conducting a hearing on an unrelated motion, he informed the parties of his intent to order a revaluation of Microfibres as of a more current date. In response, on August 21, 2009, Hope filed an "objection to and motion for reconsideration of" the trial justice's decision to revalue the company. On August 27, 2009, the trial justice held a hearing on Hope's motion to reconsider; however, he denied that motion and he ordered that the two companies be revalued as of September 1, 2009. Then, on January 19, 2010, the trial justice ordered the parties to suspend their revaluation efforts, because he had decided to equitably distribute the stock of the companies without placing a value on them.

In the past, this Court has held that "[a] stipulation entered into with the assent of counsel and their clients, relative to an evidentiary fact or an element of a claim, is conclusive upon the parties and removes the issue from the controversy," and therefore, "[i]t is no longer a question for consideration by the tribunal." In re McBurney Law Services, Inc., 798 A.2d 877, 881-82 (R.I. 2002). Furthermore, we have held that "[a]n order consented to by the parties can not be 'opened, changed or set aside without the assent of the parties in the absence of fraud, mutual mistake or actual absence of consent[.]'" Id. at 882 (quoting Douglas Construction and Supply Corp. v. Wholesale Center of North Main Street, Inc., 119 R.I. 449, 452, 379 A.2d 917, 918 (1977)).

In this case, the parties entered into a consent order—that was agreed to by the parties and their counsel—which established the valuation date for the marital property. As a result, in the usual case, this valuation date would "no longer [be] a question for consideration by the tribunal." In re McBurney Law Services, Inc., 798 A.2d at 882. However, in this case, paragraph thirty-three of the consent agreement expressly allows either party to challenge the valuation date based on a change in circumstances, if the trial justice finds that it is "an extraordinary change in circumstances that could not have been contemplated by the parties."

Although James arguably challenged the agreed-upon valuation date in his posttrial memorandum, and the trial justice did hold a hearing—albeit after rendering his decision on that specific issue—we believe that the manner in which the trial justice made his decision to disregard the valuation date was error, given the sanctity that our law confers upon consent orders. See In re McBurney Law Services, Inc., 798 A.2d at 881-82. First, the hearing was held on Hope's motion to reconsider—not James's challenge—and it did not occur until after the trial justice had already informed the parties that he intended to establish a new valuation date. Furthermore, even the trial justice at one point described his decision to order a revaluation of the companies as "sua sponte," which indicates that he was not ruling on James's challenge, but rather, that he had decided on his own that the agreed-upon valuation date should be abandoned. Indeed, at the hearing on Hope's motion to reconsider, the trial justice never mentioned James's posttrial challenge to the valuation date. Therefore, the manner in which the trial justice deviated from the terms of the consent order—to which the parties had agreed, and which the trial justice himself had earlier approved—constituted error.

Although it would have been more appropriate for the trial justice to have explicitly ruled on James's challenge to the valuation date, and, more importantly, to have held a hearing before

making this ruling, we nonetheless cannot say that this error, on its own, requires that the matter be remanded for a rehearing. We see little to be gained by holding the parties to a valuation date of five-and-a-half years ago, and, after a thorough review of the record, we do not believe that remanding the matter for a proper hearing on James's challenge to the valuation date will, in any way, change the trial justice's decision to depart from the date contained in the consent order.[7] However, because the trial justice erred when he declined to value his assignments of Microfibres and MPL, as discussed in the previous section of this opinion, we remand this case for a trial to determine those values, as of the date of that trial, unless the parties reach a new agreement regarding a valuation date. See Curry, 987 A.2d at 246 (holding that "marital assets should be valued as of the date of trial" quoting Gervais, 735 A.2d at 214); see also Esposito v. Esposito, 38 A.3d 1, 6 (R.I. 2012) ("Parties may make an express agreement to change the terminal date for equitable distribution * * *." quoting Ruffel, 900 A.2d at 1185).

**B**

**Assessment of Fees**

In Hope's next line of argument, she contends that the trial justice erred when he denied her requests for reimbursement of fees for attorneys', experts', and the court-appointed supervisor for James's visits with Lucas. First, Hope argues that the trial justice "abused [his] discretion when [he] did not require [James] to reimburse Hope for her legal fees and costs [incurred in her

---

[7] Hope asserts that James never gave notice that he was challenging the valuation date based on a change in circumstances, as required by the terms of the consent order. However, on October 17, 2008, the same day that the consent order was entered into, James's attorneys informed Hope's attorneys, via email, that they "consider[ed] the current worldwide economic conditions exceptional circumstances that were not in contemplation of the parties at the time of the stipulation concerning the valuation date for [Microfibres], and that such circumstance may have a material impact on the value of [Microfibres], and otherwise." In our opinion, this email sufficiently "disclosed [the] change of circumstances," as required by the consent order, and provided Hope with sufficient notice of James's challenge.

- 23 -

efforts] to establish that [James] did not obtain Microfibres by inheritance in connection with [her] summary judgment motion" concerning whether the company was a marital asset. She contends that she should have been awarded attorneys' fees associated with that summary judgment motion because James took an "unreasonable and untenable position" "[i]n the face of overwhelming, undisputed evidence" to the contrary. Additionally, she contends that she should have been awarded a portion of her legal fees and costs because James was "recalcitrant in providing discovery in this case."

Generally, in a divorce matter, "[a]n award of attorney's fees is not punitive in nature but serves to ensure that a spouse who lacks financial stability is still able to secure competent representation in the divorce proceeding." Thompson, 642 A.2d at 1165. Thus, as the trial justice held, "[i]t is well established that 'before awarding counsel fees, the trial justice must determine that the party seeking the award is without funds or property available to pay the fees and that the spouse who will be charged with payment of the fees has the financial ability to satisfy the obligation.'" Id. (quoting Stevenson, 511 A.2d at 967 n.6). Here, however, the trial justice found that Hope had "substantial liquid assets," and, consequently, "ha[d] the ability to compensate her own attorneys."

Before this Court, Hope argues that that holding by the trial justice was an abuse of discretion because her request for attorneys' fees was not based on her inability to pay, but instead on "[James]'s conduct in this case." Thus, in reality, Hope is asking this Court to impose a sanction on James by exercising our "inherent power to fashion an appropriate remedy that would serve the ends of justice." Blue Cross & Blue Shield of Rhode Island v. Najarian, 911 A.2d 706, 711 n.5 (R.I. 2006) (quoting Vincent v. Musone, 574 A.2d 1234, 1235 (R.I. 1990)). But, as we have held in the past,

"[t]his remedy * * * is available only in one of three narrowly defined circumstances: (1) pursuant to the 'common fund exception' that 'allows a court to award attorney's fees to a party whose litigation efforts directly benefit others[,]' * * *; (2) 'as a sanction for the willful disobedience of a court order[,]' * * *; or (3) when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" Id. (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 45, 45-46 (1991)).

Hope does not argue that either of the first two circumstances exist in this case, but only that "[James]'s conduct" during the litigation warrants an award of legal fees. However, in our opinion, Hope has failed to demonstrate that James "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Id. (quoting Chambers, 501 U.S. at 45-46). Therefore, we cannot say that the trial justice abused his discretion when he denied Hope's request for attorneys' fees.

Next, Hope argues that the trial justice erred when he denied her request that James be required to reimburse the marital estate for his expert fees and for her legal fees incurred in countering those experts. Hope contends that James should reimburse the marital estate because he later did an about-face and abandoned his experts' opinions in his posttrial memorandum and, thus, he needlessly squandered marital assets when he hired the experts in the first place. James argues that the trial justice was correct when he denied Hope's request for expert fees, because the experts did not possess sufficient information to value the China venture and they were hired to opine as to the value of Microfibres before the world economy was thrown into the throes of economic crisis. Therefore, James argues, there should be no basis to sanction him for declining to argue values that he believed were no longer valid or that had lost relevance because of the China venture. We agree.

As Jay Fishman—the court-appointed valuation expert—testified, "there ha[d] been a meltdown in the financial market since" the stipulated valuation date. Furthermore, he said that "[b]oth [parties'] experts received insufficient information and, therefore, I received insufficient

- 25 -

information to place a value or an economic benefit on the China venture at [the stipulated valuation date]." Additionally, in his decision, the trial justice said that, after the economic crisis and without sufficient evidence on the China venture, he "d[id] not have before [him] any probative or credible evidence upon which to base a fair and reasonable valuation of the value of the stock in th[e] corporation." Based on Fishman's testimony, which the trial justice found to be credible, James should not be required to reimburse the marital estate for his experts' fees simply because he challenged the efficacy of their valuations at a later date. Furthermore, Hope fails to cite a single case to support her contention that a party in James's position should be required to reimburse a marital estate after changing his position about his experts' findings. Therefore, we see no error in the trial justice's denial of Hope's request for expert fees.

Hope's last argument regarding fees is that the trial justice abused his discretion when he did not order James to pay her share of the costs of the supervised visits between James and Lucas, because, according to Hope, the supervision was necessary as a result of James's conduct. However, this argument is not well developed. Hope commits only four sentences to it in her brief. Additionally, she cites no legal authority to support her allegation that the trial justice abused his discretion when he declined to order James to pay those fees. Therefore, she has presented nothing to this Court that would warrant a reversal of the trial justice's denial of her request. See Bucci, 2013 WL 1498655, at *16 n.17 ("[a] mere passing reference to an argument such as this, without meaningful elaboration, will not suffice to merit appellate review." quoting State v. Day, 925 A.2d 962, 974 n.19 (R.I. 2007)).

## C

## Will, Trust, and Estate-Planning Documents

Hope's final argument is that the trial justice erred when he denied her request that James disclose information about his will, trusts, and other estate-planning documents. First, she argues that James should have been ordered to disclose these documents because they were relevant to the issue of whether James was unfaithful. James counters by arguing that there is no evidence in the record that suggests that he was unfaithful and, therefore, that the trial justice did not abuse his discretion when he denied Hope's request.

After a careful review of the record, we cannot say that the trial justice abused his discretion when he refused to order James to disclose his will and estate-planning documents. Hope offers very little reasoning for her argument, other than to say that these documents "were relevant to whether [James] was unfaithful to Hope prior to this divorce being final," because "[James] refused to disclose [one of] the new beneficiar[ies]." She suggests no other evidence of unfaithfulness, and we can find no such evidence in the record. Therefore, the trial justice was well within his discretion to deny her discovery request for James's will and other estate-planning documents. See Dawkins, 22 A.3d at 1150 (recognizing a trial justice's "broad discretion" in ruling on discovery motions (quoting Hindle, 748 A.2d at 259)).

Next, Hope argues that the trial justice erred when he denied her motion to compel disclosure of information about James's trusts; however, we do not believe that the trial justice abused his discretion when he denied this motion. On January 19, 2010, the trial justice conducted a hearing on Hope's motion to compel further discovery of James's trusts. In denying the motion, the trial justice said that, at that juncture, he had not yet distributed the marital estate and that James had made no indication that he would not be able to comply with any order of

assignment. Therefore, the trial justice held that the requested information concerning James's trusts would not be relevant until after the assignment of marital property. Likewise, we are of the opinion that any review of the denial of this motion would be premature, because we are vacating, in part, the decision pending entry of final judgment in this case, which will require a new equitable distribution of the marital estate. Accordingly, we decline to address this issue on the merits at this time.

Finally, Hope argues that the information about James's trusts was relevant to the issue of alimony; however, in our opinion, the trial justice did not abuse his discretion when he denied the motion. In his decision, the trial justice quoted § 15-5-16(c)(2), which provides, in pertinent part, that "[a]limony is designed to provide support for a spouse for a reasonable length of time to enable the recipient to become financially independent and self-sufficient." He then specifically found that Hope had "sufficient assets and income" such that "an award of alimony would not be justified." We do not see how ordering the disclosure of additional information about James's trusts would have, in any way, changed this finding. Therefore, upon review, we discern no error by the trial justice.[8] See Dawkins, 22 A.3d at 1150.

## D

### James's Conditional Cross-appeal

After Hope filed her appeal in this case, James filed a protective and conditional cross-appeal, arguing that the trial justice erred when he granted partial summary judgment and found Microfibres to be a marital asset. James avowed that he would not press this issue on appeal if

---

[8] Hope further contends that the information about James's trusts was relevant to the issue of child support. However, on June 18, 2013, Lucas turned nineteen years old, thus, likely rendering any issue concerning child support moot. See § 15-5-16.2(b) ("The court may, if in its discretion it deems it necessary or advisable, order child support * * *, but in no case beyond [a child's] nineteenth (19th) birthday."). Therefore, we need not address Hope's argument about this discovery motion as it relates to child support for Lucas.

this Court affirmed the Family Court's decision pending entry of final judgment; however, because we now vacate part of that decision, we shall address James's conditional cross-appeal.

In his cross-appeal, James raises two arguments. First, he contends that the trial justice erred when he concluded that an advance on inheritance—which occurred while the transferor was alive—was not a "transfer[] to one of the parties by inheritance" under § 15-5-16.1(b), and, therefore, such an advancement was marital property.[9] Furthermore, James argues that the trial justice erred by deciding a question of fact on summary judgment when he found that James's acquisition of the stock in Microfibres was not an advance on his inheritance. Assuming, without deciding, that an advance on inheritance should be considered to be a "transfer[] * * * by inheritance" under § 15-5-16.1(b), which would render those assets nonmarital, we hold that there was no genuine issue of material fact that would have precluded summary judgment, and we agree with the trial justice that, as a matter of law, the transfer of Microfibres stock was, in fact, a sale.

The transfer of the stock to James was part of a larger recapitalization of the company. On November 15, 1989, James sent an "offer to purchase for $105,000 in cash the 30,000 shares of Common Stock of Microfibres, Inc." to the trustees of the trust that owned the stock at that time. Then, in a series of letters, the trustees accepted James's offer to purchase the stock. Additionally, other internal company documents evidence the recapitalization and refer to the transfer of stock to James as a "purchase" and "sale."

---

[9] Section 15-5-16.1(a) provides, in pertinent part, that "[i]n addition to or in lieu of an order to pay spousal support made pursuant to a complaint for divorce, the court may assign to either the husband or wife a portion of the estate of the other," however, "[t]he court * * * shall not assign property or an interest in property which has been transferred to one of the parties by inheritance before, during, or after the term of the marriage." Section 15-5-16.1(b).

- 29 -

At the summary judgment hearing, the trial justice held that these documents were "clear, unequivocal, and unambiguous." He then went on to say:

> "The meaning of the word 'sale' and 'purchase' have no ambiguity, which would leave room for the [c]ourt to further render interpretation. [James] paid $105,000 for stock in the corporation which had been independently appraised for [$]64,562. The money that [James] paid was a bonus to him by the corporation, which was clearly marital funds, a marital asset subject to assignment under Section 15-5-16.1. There is no issue of fact * * *."

On appeal, James does not dispute the characterization of the "paper transaction"; however, he argues that his and his father's intent as to whether the transfer of stock was an inheritance was a question of fact that was inappropriately decided on summary judgment. However, it is well settled that "[w]hen a contract is unambiguous, * * * the intent of the parties becomes irrelevant." Vincent Co. v. First National Supermarkets, Inc., 683 A.2d 361, 363 (R.I. 1996) (holding that "we need not examine the intent of the parties since the language of [the contract] is clear, unambiguous, and open to only one reasonable interpretation"). Thus, "[w]hen contract language is clear and unambiguous, words contained therein will be given their usual and ordinary meaning and the parties will be bound by such meaning." Singer v. Singer, 692 A.2d 691, 692 (R.I. 1997) (mem.).

The documentary evidence in this case leaves no doubt that the transfer of stock to James was a sale. The terms "purchase" and "sale" that are used in James's offer and the trustees' acceptances are unambiguous and are not "reasonably susceptible of different constructions." Paul v. Paul, 986 A.2d 989, 993 (R.I. 2010) (quoting Andrukiewicz v. Andrukiewicz, 860 A.2d 235, 238 (R.I. 2004)). Thus, the intent behind the transaction was irrelevant. Vincent Co., 683 A.2d at 363.

- 30 -

Furthermore, this Court has held that, where a transfer was made to appear like a sale and included all indicia of a sale, it was not erroneous for the trial justice to rule that the transaction was, in fact, a sale, regardless of the parties' ulterior intent. Gervais v. Gervais, 688 A.2d 1303, 1305-06 (R.I. 1997).[10]  In Gervais, the husband in a divorce proceeding argued that certain disputed "assets were derived from the sale of a company that he had acquired by virtue of two separate gifts of stock," and, therefore, he maintained that the assets were not marital property. Id. at 1305.  The husband "contend[ed] this last transfer was made to appear like a sale in order to avoid federal gift and estate taxes but that it was in reality a gift in disguise." Id. (emphasis added).  Nevertheless, this Court found no error in the trial justice's ruling that the transfer of stock was a sale—not a gift—because, regardless of the husband's intent, "the transfer at its inception had all indicia of a sale." Id. at 1306.

Therefore, based on the precedent set forth in Gervais and the unambiguous terminology used in the transaction, any possible hidden intent of the parties is irrelevant to the analysis of whether the Microfibres stock constituted marital property and, thus, there was no genuine issue of material fact.  As a result, the trial justice did not err when he granted partial summary judgment in favor of Hope and held that the Microfibres stock was marital property.

## IV

### Conclusion

For the reasons set forth in this opinion, we affirm those parts of the Family Court's decision pending entry of final judgment that address the portion of MPL that is martial property, as well as the denial of Hope's request for attorneys', expert, and other fees.  Furthermore, we

---

[10] Although Gervais v. Gervais, 688 A.2d 1303, 1304-05 (R.I. 1997), was decided after a trial on the merits, we are satisfied that here, summary judgment was appropriate because the documents were clear, unequivocal, and open to only one reasonable interpretation.

affirm the trial justice's denial of Hope's motion for disclosure of information about James's will and estate-planning documents, and we affirm the trial justice's grant of partial summary judgment holding that the stock of Microfibres was marital property.

However, we vacate the portion of the decision pending entry of final judgment that addresses the equitable distribution of the marital estate, and we remand the case to the Family Court for further proceedings consistent with this opinion. On remand, the Family Court shall value Microfibres and MPL as of the date of trial and distribute the marital estate in accordance with § 15-5-16.1. The trial justice shall permit the parties to supplement the existing record by offering any additional testimony or other evidence that may assist him. The Family Court then shall issue a decision pending entry of final judgment that is not inconsistent with this opinion.


**TITLE OF CASE:**    Hope Billings McCulloch v. James Robert McCulloch.

**CASE NO:**    No. 2011-139-Appeal.
No. 2010-433-Appeal.
(P06-1525)

**COURT:**    Supreme Court

**DATE OPINION FILED:**    June 25, 2013

**JUSTICES:**    Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**    Associate Justice Francis X. Flaherty

**SOURCE OF APPEAL:**    Providence County Family Court

**JUDGE FROM LOWER COURT**:

Associate Justice Howard I. Lipsey

**ATTORNEYS ON APPEAL:**

For Plaintiff:  David A. Wollin, Esq.

For Defendant:  Lauren E. Jones, Esq.