**Supreme Court**

No. 2013-1-Appeal.
(P05-2770)

Stephen Carney, Jr.                    :

        v.                              :

Sandra Carney.                         :

NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Stephen Carney, Jr.          :

v.          :

Sandra Carney.          :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

### O P I N I O N

**Justice Flaherty, for the Court.**  The defendant, Sandra Carney, appeals an order of the Family Court in favor of the plaintiff, her former husband, Stephen Carney, Jr.[1]  On February 26, 2014, this case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided.  We have considered the record as well as the written and oral submissions of the parties, conclude that cause has not been shown, and proceed to decide the appeal without further briefing or argument.  For the reasons set forth in this opinion, we affirm in part and reverse in part the order of the Family Court, and we remand the case to that tribunal for further findings of fact.

---

[1] We refer to the parties by their first names for clarity and convenience to the reader.  No disrespect is intended.

## Facts and Travel

On November 22, 2006, a justice of the Family Court entered final judgment on the divorce between Stephen and Sandra Carney, ending a marriage of nearly seventeen years. When final judgment entered, the couple were the parents of two boys, aged four and eight. The parties had entered into a marriage settlement agreement (MSA), which the Family Court had approved and incorporated by reference, but not merged, into the final judgment. A dispute over the interpretation of a particular paragraph of this agreement has led the parties to this Court.

At the time of divorce, the parties were joint owners of their home at 12 Starbrook Drive in Barrington. Under the terms of the MSA, Stephen agreed to convey his interest in the marital domicile to Sandra via quitclaim deed. In return, Sandra agreed that she would be responsible for all costs associated with the house; she also agreed to refinance the property so that Stephen would be released from any obligation on the promissory note financing the property and the mortgage securing the note. Particular to the issues confronting us in this appeal, paragraph seven of the MSA contained the following provision:

> "Further still it is agreed that the defendant shall pay to the plaintiff as equitable distribution the sum of $100,000.00 at the end of calendar year 2024. Provided however, in the event that the defendant/wife shall cohabit for more than sixty (60) consecutive days with a member of the opposite sex or, in the event she remarries she shall have the obligation to pay to the plaintiff/husband the aforementioned sum of $100,000.00 at that time. In the event that the sale price of former marital domicile, when sold should be less than $475,000.00 then it is agreed by and between the parties that the plaintiff/husband's equitable distribution amount relative to this piece of property shall be

reduced by 50% of the difference between the sale price and the sum of $475,000.00."[2]

The MSA also included an "Enrichment Activities" provision which stated that "[t]he parties shall be responsible on a pro rata basis, based upon their respective incomes for sporting equipment/fees, school field trips, camps, enrichment lessons and tutorial services * * * ."

In 2011, Sandra, after apparently tiring of maintaining such a large house, entered into a purchase and sale agreement to sell the property and sold it on May 23, 2011, for $356,250.[3]  On June 30, 2011, Stephen filed a motion to enforce the MSA or, in the alternative, to adjudge Sandra in contempt.  In his motion, Stephen argued that Sandra had failed to comply with the MSA because she did not pay the equitable distribution to him upon the sale of the former marital domicile.  Sandra then filed her own motion, in which she alleged that, in violation of the MSA, Stephen had failed to pay alimony, contribute to the college education funds for their two children, and cover expenses for child care and camp.

After conducting a hearing, a justice of the Family Court issued an order on February 10, 2012, that disposed of several points of contention between the parties and outlined the remaining issues, including those before us on appeal, for which the court needed either further documentation or hearing.  On May 30, 2012, the trial justice heard arguments on those issues. After concluding that the parties would not be able to resolve their differences by agreement, the trial justice interpreted paragraph seven of the MSA to mean that when the agreement was executed, it was the intent of the parties that Sandra and the two children would remain in the marital domicile and that the property would not be sold during the minority of the children.

---

[2] Notably, the couple's youngest son will attain the age of twenty-two in the year 2024.

[3] Stephen employed several procedural maneuvers to prevent the sale of the former marital domicile, all of which proved to be unsuccessful.

The trial justice then focused on the two triggering events that would provide for immediate payment to Stephen, namely, if Sandra were to remarry or cohabit. The trial justice also determined that the third provision of paragraph seven, which laid out a formula for payment to Stephen in the event of the sale of the property, functioned as another triggering event that would entitle Stephen to payment immediately. The trial justice reasoned that the parties intended immediate equitable distribution in the event of a sale occurring before 2024 because it would have been illogical for them to assume that the value of the property would be only $475,000 in 2024 "[g]iven what we know about real estate[.]" Next, the trial justice applied the formula and concluded that the amount Sandra was to pay Stephen was one-half of the difference between the sale price of $356,250 and $475,000, which would result in a payment to Stephen of $59,375. The trial justice gave Sandra until September 2012 to produce that amount. Finally, the trial justice concluded during the hearing that the responsibility for paying for the children's "enrichment activities" would be divided evenly between the parties. The trial justice issued an order memorializing her findings on October 2, 2012. Sandra timely appealed to this Court.

## II

### Standard of Review

A marriage settlement agreement "that is not merged into a divorce judgment retains the characteristics of a contract." Riffenburg v. Riffenburg, 585 A.2d 627, 630 (R.I. 1991). "The existence of ambiguity in a contract is a question of law." Paul v. Paul, 986 A.2d 989, 993 (R.I. 2010) (citing Young v. Warwick Rollermagic Skating Center, Inc., 973 A.2d 553, 558 (R.I. 2009)). "[T]he holding of a trial court (including the Family Court) about the existence or nonexistence of ambiguity in the terms of the contract is freely reviewable by this Court." Id.

(quoting Gorman v. Gorman, 883 A.2d 732, 738 n.8 (R.I. 2005)).  Therefore, the trial justice's conclusions on questions of law are reviewed de novo.  Beacon Mutual Insurance Co. v. Spino Brothers, Inc., 11 A.3d 645, 649 (R.I. 2011) (citing International Brotherhood of Police Officers v. City of East Providence, 989 A.2d 106, 108 (R.I. 2010)).  Conversely, we afford deference to the trial justice's findings of fact and will disturb them only if she "misconceived the relevant evidence or was otherwise clearly wrong."  Horton v. Horton, 891 A.2d 885, 888 (R.I. 2006) (quoting Koutroumanos v. Tzeremes, 865 A.2d 1091, 1097 (R.I. 2005)).

## III

### Discussion

On appeal before this Court, Sandra presses three arguments.  First, she contends that the trial justice erred when she determined that Sandra was required to pay Stephen when the property was sold, and not in 2024.  Second, Sandra maintains that the trial justice erred in calculating the amount of money she owes to Stephen from the sale of the property.  Finally, defendant argues that the trial justice improperly modified the terms of the MSA when she ordered the parties to equally share in the costs of extracurricular and child-enrichment activity expenses.

### A

### Is the MSA ambiguous?

Before this Court, Sandra argues that the trial justice misconstrued the language of the MSA when she found paragraph seven to be ambiguous and when she ordered Sandra to pay Stephen upon the sale of the property.  Although the trial justice did not use the term "ambiguous" in her ruling, her analysis of the parties' intent can lead to no other conclusion.  To the contrary, Sandra maintains that the language of paragraph seven states clearly and

unambiguously that the equitable-distribution payment owed to Stephen is not to be disbursed until 2024 unless either of the two triggering events occurs before then. Sandra supports this contention by indicating that paragraph seven encompasses but two events that would accelerate payment to Stephen prior to 2024, neither of which involves the sale of the property. Therefore, Sandra reasons, she may sell the property whenever she wishes and, unless she remarries or cohabits, is free from paying Stephen the equitable distribution set forth in the MSA until "the end of calendar year 2024."

Conversely, Stephen argues that the language in the MSA about the timing of the payment of the equitable distribution is ambiguous. He maintains that because the MSA provides for acceleration of the payment in two circumstances that are economically beneficial to Sandra (cohabitation or remarriage), sale of the property also would provide an economic benefit, and it therefore should be construed as a third triggering event.

"A reviewing court has no need to construe contractual provisions unless those terms are ambiguous." A.F. Lusi Construction, Inc. v. Peerless Insurance Co., 847 A.2d 254, 258 (R.I. 2004). We have consistently held that a contract provision is ambiguous if it is "reasonably susceptible of different constructions." Paul, 986 A.2d at 993 (quoting Andrukiewicz v. Andrukiewicz, 860 A.2d 235, 238 (R.I. 2004)). We determine ambiguity by "view[ing] the agreement in its entirety and giv[ing] to its language its 'plain, ordinary and usual meaning.'" Vickers Antone v. Vickers, 610 A.2d 120, 123 (R.I. 1992) (quoting Amica Mutual Insurance Co. v. Streicker, 583 A.2d 550, 552 (R.I. 1990)). Such amphibology is not in the eye of the beholder "[with] ambiguity lurk[ing] in every word, sentence, and paragraph in the eyes of a skilled advocate * * * but whether the language has only one reasonable meaning when construed, not in a hypertechnical fashion, but in an ordinary, common sense manner." Paul, 986 A.2d at 993

(quoting Garden City Treatment Center, Inc. v. Coordinated Health Partners, Inc., 852 A.2d 535, 542 (R.I. 2004)).

After reviewing paragraph seven of the MSA, and after giving the terms employed their plain and ordinary meanings, we are of the opinion that paragraph seven is susceptible of two reasonable meanings and therefore is ambiguous. See Paul, 986 A.2d at 994. It would be reasonable to so conclude because there are only two triggering events specified that would accelerate the payment to Stephen and that any other discussion in the MSA about the distribution, including the formula, would affect only the amount of the payment and not the timing of its distribution. On the other hand, paragraph seven provides a distribution formula in the event the property is sold, but lists no events or occurrences that would permit a sale. Certainly, however, the term "when sold" appears to contemplate the possibility of a sale before 2024. Because the MSA does not specify when Sandra is to pay Stephen in the event of a sale, one could reasonably conclude that Stephen would receive the equitable distribution upon the sale of the property. In our opinion, paragraph seven is not susceptible to merely "one reasonable meaning" when read in a "common sense manner" and it is, therefore, ambiguous. See Garden City Treatment Center, Inc., 852 A.2d at 542 (emphasis omitted) (quoting Textron, Inc. v. Aetna Casualty and Surety Co., 638 A.2d 537, 541 (R.I. 1994)).

Once a contract has been found to be ambiguous as a matter of law, the intent of the parties must be determined. This is a finding of fact. See O'Connell v. Finlay, 583 A.2d 546, 549 (R.I. 1990). "In construing an ambiguous contract provision, it is necessary to examine both the circumstances surrounding the development of the ambiguous terms and the intention of the parties." Flynn v. Flynn, 615 A.2d 119, 121 (R.I. 1992). According to Rule 52(a) of the Family Court Rules of Procedure for Domestic Relations, the court "shall find the facts specially and

state separately its conclusions of law." Cf. Connor v. Schlemmer, 996 A.2d 98, 109 (R.I. 2010) (citing Rule 52(a) of the Superior Court Rules of Civil Procedure and the similar requirement of the Superior Court to make findings of fact). Here, the trial justice apparently assumed that it was the intent of the parties that their children remain in the marital domicile until 2024, when their youngest child would turn twenty-two years old. The trial justice also concluded that a logical reading of the provision would require an immediate payment to Stephen if the property was sold because the parties would not have believed that the property would be worth less than $475,000 in 2024, given that real estate historically appreciates. Even though we defer to the trial justice's findings of fact, it is our opinion that the trial justice did not make sufficient factual findings on the record with respect to the intent of the parties, and the matter consequently cannot be accorded deference. Therefore, we remand the case to the Family Court to make findings of fact about the intent of the parties at the time they entered into the agreement with respect to the timing of the payment of the equitable distribution. In so doing, the trial justice may hear additional testimony or supplement the record with further documentation.

**B**

**The Calculation of the Equitable Distribution**

Secondly, Sandra argues that the trial justice erred in her calculations about the amount that defendant owed to plaintiff when the house was sold. The trial justice determined that Sandra was indebted to Stephen in the amount of $59,375, which is one-half of the difference between the sale price and $475,000. Sandra maintains that the unambiguous language of the

MSA can mean only that the amount owed to Stephen is $40,625.[4]  On this point, we agree with defendant that the trial justice erred in her calculations.

The MSA says that Sandra will pay Stephen the sum of $100,000 as his equitable distribution for the marital domicile in 2024.  Next, the MSA provides that, should the sale price of the property be for less than $475,000, Stephen's equitable distribution "shall be reduced by 50% of the difference between the sale price and the sum of $475,000.00."  The trial justice stated that the "only logical interpretation and plain meaning" of that language would be to deduct the sale price of $356,250 from $475,000 and take fifty percent of the resulting number, which produces $59,375.  We disagree.  "When contract language is clear and unambiguous, words contained therein will be given their usual and ordinary meaning and the parties will be bound by such meaning."  Singer v. Singer, 692 A.2d 691, 692 (R.I. 1997) (mem.).  In our opinion, the trial justice was correct in her conclusion that the language is unambiguous.  However, we disagree with her application of the formula expressed by that unambiguous language.  See McCulloch v. McCulloch, 69 A.3d 810, 829-30 (R.I. 2013).

In our view, the only reasonable interpretation of the contractual provision is that Stephen's equitable distribution amounts to $40,625.  That sum is arrived at by taking fifty percent of the difference between the sale price ($356,250) and $475,000, the result of which is $59,375.  At that point, the formula is clear that the $100,000 is reduced by $59,375.  The resulting total is $40,625.  The trial justice appears to have simply divided the difference in half which overlooks the final step in the calculation.  We have consistently held that "every word of the contract should be given meaning and effect; an interpretation that reduces certain words to

---

[4] We note that in the briefings filed with this Court, Stephen acknowledges defendant's argument, but does not respond or provide a counterargument to Sandra's contention.  However, during oral argument, Stephen maintained that the trial justice correctly applied the formula.

the status of surplusage should be rejected." Andrukiewicz, 860 A.2d at 239. Therefore, the trial justice erred in her calculation, and Sandra is obligated to pay to Stephen the amount equaling $40,625 as his equitable distribution for the property. The timing of the payment, however, is dependent upon the trial justice's findings of fact following remand.

## C

### The Modification of the MSA

Finally, defendant contends that the trial justice erred when she ordered the parties to share equally in the payment of extracurricular activities and child-care expenses because this order improperly modified the terms of the MSA.[5] However, it is our opinion that this issue has not been properly preserved for our review. It is well settled under our raise-or-waive rule that "issues that are raised for the first time on appeal will not be reviewed by this Court." DeAngelis v. DeAngelis, 923 A.2d 1274, 1280 (R.I. 2007). During the hearing on May 30, the trial justice said on the record that the parties had reached an agreement that the enrichment activities would be split by Sandra and Stephen equally. Sandra did not object to the trial justice's open-court assertion that the parties had agreed to share in these costs equally, nor was any objection raised when an order to that effect was entered. Consequently, this issue has been waived, and we will not address it on appeal.

## IV

### Conclusion

For the reasons set forth in this opinion, we affirm in part and reverse in part the order of the Family Court. We remand this case to the Family Court to allow the trial justice to make findings of fact with respect to the intent of the parties regarding when Stephen should receive

---

[5] The MSA says that such expenses are to be divided pro rata, based on the respective incomes of the parties.

- 10 -

the equitable distribution in the event of a property sale before 2024. The record may be returned to that tribunal.



**TITLE OF CASE:**          Stephen Carney, Jr. v. Sandra Carney.

**CASE NO:**                    No. 2013-1-Appeal.
                                        (P05-2770)

**COURT:**                       Supreme Court

**DATE OPINION FILED:**   April 25, 2014

**JUSTICES:**                    Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**              Associate Justice Francis X. Flaherty

**SOURCE OF APPEAL:**   Providence County Family Court

**JUDGE FROM LOWER COURT**:

                                        Associate Justice Laureen A. D'Ambra

**ATTORNEYS ON APPEAL:**

                                        For Plaintiff:  Cristine L. McBurney, Esq.

                                        For Defendant:  Barbara E. Grady, Esq.