April 4, 2019

**Supreme Court**

No. 2018-36-Appeal.
(WC 16-208)

:

In re: 25 Burnside Avenue, Narragansett,   :
Rhode Island.

:

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

                                    :

In re: 25 Burnside Avenue, Narragansett,    :
Rhode Island.

                                    :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.** Kevin Hunt, an interested party in this receivership case, appeals from a Superior Court decision and order authorizing the permanent receiver to distribute the proceeds from the sale of 25 Burnside Avenue in Narragansett in accordance with the receiver's recommendations. On appeal, Kevin argues that the Superior Court justice erred by (1) misreading and misapplying the provisions of a marital settlement agreement in distributing the proceeds from the sale of the property; (2) attributing the entire balance of an outstanding mortgage to Kevin's share of the proceeds; and (3) ordering Kevin to pay rent retroactively. This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After considering the parties' written and oral submissions and reviewing the record, we conclude that cause has not been shown and that this case may be decided without further briefing or argument. For the reasons set forth in this opinion, we affirm in part and vacate in part the order of the Superior Court.

**I**

**Facts and Travel**

25 Burnside Avenue in Narragansett, Rhode Island (the property) is an ocean view, single-family home located approximately 200 to 300 yards from Scarborough State Beach. From 2002 to 2006, Kevin Hunt (Kevin) and the petitioner, Alice Hunt (Allie),[1] owned the property as tenants by the entirety and lived there together with their daughter. On June 27, 2006, the Family Court entered a final judgment on the divorce between Kevin and Allie, dissolving their thirteen-year marriage. Kevin and Allie had entered into a marriage settlement agreement (the MSA) on January 20, 2006, which was incorporated but not merged into the final judgment of divorce. Under the terms of the MSA, Kevin and Allie agreed that the property had a fair market value of $900,000 as of the date of the MSA.[2] The MSA also provided that Kevin would vacate the property and Allie would have its exclusive use no later than April 15, 2006.

Section 3 of the MSA sets forth Kevin's and Allie's agreement with respect to the ultimate division and distribution of the property. Under Subsection 3(C), Kevin was responsible for certain specified expenses until December 31, 2009, including mortgage payments, taxes, utilities, assessments, and all expenses related to maintenance and repair. In consideration of his making

---

[1] As the central figures in this appeal are former spouses and share the same surname, we shall refer to them by their first names to avoid any confusion. No disrespect is intended.

[2] The full text of Subsection 3(A) of the MSA, "Fair Market Value/Equity," provides:

> "The parties own jointly the real estate located at 25 Burnside Avenue, Narragansett, Rhode Island. Both Wife and Husband agree the property has a fair market value of Nine Hundred Thousand ($900,000.00) Dollars as of the date of the execution of this Agreement, with an outstanding mortgage to Citizens Bank in the amount of Three Hundred Sixty Thousand ($360,000.00) Dollars, for net equity of Five Hundred Forty Thousand ($540,000.00) Dollars.

> "The Husband represents to the Wife that said property has not been used as collateral for any business ventures he has participated in."

all such payments, contemplated to be approximately $100,000 per year, Kevin was to purchase

Allie's interest in the property for 38 percent of the net equity value as of December 31, 2009

under Subsection 3(D) (the Buyout Provision).[3]  In the event, however, that Kevin was "unable to

make all payments as set forth [in the MSA]," Subsection 3(D) also provided that the property was

to be sold and the net proceeds divided equally (the Sale Provision).  Subsection 3(E) clarifies that

---

[3] The full text of Subsection 3(D), "Payment for Wife's Interest in Property," provides:

> "In consideration of the Husband's payment of all expenses set forth within Paragraph (C) referenced above for the period of four (4) years with a contemplated expense of approximately One Hundred Thousand ($100,000.00) Dollars per year, the Wife shall be paid the equivalent of thirty-eight (38%) percent of the net equity value of the property as of December 31, 2009.

> "Both Husband and Wife agree that in order to determine the fair market value of said property as of December 31, 2009, a real estate appraisal of said property shall be performed by an expert real estate appraiser.  Both Husband and Wife will each have the opportunity to have said property appraised and in the event that an agreement cannot be reached as to fair market value.  Thereafter, the Wife shall receive thirty-eight (38%) percent of the then existing net equity after deducting from said fair market value the outstanding mortgage balance on the Citizens Bank mortgage.

> "In the event that the Husband is unable to make all payments as set forth herein, the property shall be placed on the market for the best available price and sold as soon as possible.  Thereafter, the Wife shall receive fifty (50%) [percent] of the net proceeds therefrom.

> "The Husband shall not pledge the property located at 25 Burnside Avenue, Narragansett, Rhode Island for any personal or business obligations.

> "Neither Husband nor Wife shall increase the outstanding mortgage on the property, nor encumber it with any other liens whatsoever during the four year period ending on December 31, 2009."

Allie "shall convey to [Kevin] all right, title, and interest in and to said property contemporaneous with [Kevin's] payment of the net equity percentage due and owing to [Allie] * * *."[4]

The MSA also states that, at the time of its execution, there was a $360,000[5] outstanding mortgage to Citizens Bank[6] on the property (the 2004 Mortgage). Both Kevin and Allie signed the 2004 mortgage deed, but only Kevin signed the related promissory note (the 2004 Note). The parties agreed in the MSA, at Subsection 3(A), that, by subtracting the outstanding mortgage amount from the agreed-upon $900,000 fair market value, the property's "net equity" value was $540,000 at the time of the MSA's execution. Finally, during the four-year period ending December 31, 2009, neither party was to increase the outstanding mortgage, nor encumber the property with further liens.

December 31, 2009 came and went. No conveyances were made, nor was the property listed and sold. In fact, Allie continued to live at the property with her and Kevin's daughter until March 2012, when the Family Court granted Allie permission to temporarily relocate to California with the child. The Family Court order included a provision stating that Allie would continue to

---

[4] The full text of Subsection 3(E), "Conveyance of Property – December 31, 2009," provides:

> "The Wife shall convey to the Husband all right, title, and interest in and to said property contemporaneous with the Husband's payment of the net equity percentage due and owing to the Wife as set forth within paragraph 3(D) herein."

[5] It is unclear how the parties arrived at this amount. According to the Receiver's Recommendation on Allowance of Claims, at the time of the MSA's execution, the only recorded encumbrance was the 2004 Mortgage with Citizens Bank in the amount of $190,000. Approximately one month after the parties executed the MSA, an additional mortgage to Citizen Bank for $150,000 was executed and recorded. Kevin's counsel represented to the Superior Court that the 2006 Mortgage had been applied for prior to the execution of the MSA. Even if the parties intended the MSA to reflect both mortgages, however, the $360,000 amount stated in the MSA exceeds the sum total ($340,000) of the 2004 Mortgage and the 2006 Mortgage ($190,000 and $150,000, respectively).

[6] Both mortgages in this case were executed in favor of Citizens Bank of Rhode Island. Citizens Bank, N.A., a priority creditor, is the successor in interest to Citizens Bank of Rhode Island by virtue of a merger. We refer to this entity simply as "Citizens Bank."

have exclusive use and possession of the property "to the exclusion of [Kevin]." Nevertheless, in violation of the Family Court order, while Allie was away, Kevin moved in to the property with his two children from another relationship; he remained there for approximately four years.

According to Allie, in 2012, "in connection with an anticipated sale of the [property]," she learned that Kevin had executed an additional mortgage on February 23, 2006 (the 2006 Mortgage) and promissory note (the 2006 Note) in favor of Citizens Bank in the principal amount of $150,000. Similar to the 2004 Mortgage and the 2004 Note, both Kevin and Allie's signatures appear on the 2006 mortgage deed, but only Kevin's signature appears on the corresponding note. Allie has maintained throughout the receivership proceedings that she did not sign the 2006 mortgage deed. Allie does not dispute, however, that she signed the 2004 mortgage deed.

In early 2016, Allie learned that Citizens Bank had scheduled a sale of the property to foreclose upon the 2006 Mortgage. On April 25, 2016, Allie filed a petition for receivership to protect her equity interests in the property, which she believed took priority over the 2006 Mortgage.[7]

On April 26, 2016, the property was placed into temporary judicial receivership, and, on the same day, the Superior Court appointed Stephen Del Sesto as temporary receiver. Later, on May 23, 2016, the Superior Court appointed Del Sesto as permanent receiver (the Receiver). Kevin entered the case as an interested party. At a hearing on his permanency appointment, the Receiver told the court that he hoped to rent the property weekly during the summer months and monthly for the remainder of the year. At that time, Kevin was still living at the property and

---

[7] The record on appeal is riddled with allusions to Kevin's lack of payments under the notes, but no document in the record details his payments or lack thereof.

- 5 -

paying the property-related expenses. He was not, however, paying any rent or apparently making any mortgage payments, given Citizens Bank's initiation of foreclosure proceedings.

Kevin initially requested an additional thirty days before the Receiver engaged a real estate broker to gather more information on the loans from Citizens Bank. Allie objected to this request at a May 31, 2016 hearing, noting that, as summer quickly approached, "[t]his is the time to be marketing and selling" the property because it is "prime beach-front property[.]" Allie suggested to the court that Kevin pay fair market rent for the valuable summer months if he was going to further delay the property's sale.

The Superior Court denied Kevin's request for additional time to gather his loan documents. Kevin next filed a Chapter 13 bankruptcy petition on June 7, 2016, which, in effect, allowed him to remain at the property. The petition was eventually dismissed by the Bankruptcy Court on August 25, 2016.

In September 2016, the Receiver filed a motion for an order directing Kevin to immediately vacate the property, holding Kevin in contempt of court, and imposing sanctions against Kevin. In his motion, the Receiver stated that, at the May 23, 2016 hearing for the appointment of a permanent receiver as well as immediately after that hearing, he had informed Kevin that rent was required in order for Kevin to remain at the property. The Receiver argued that renting the property weekly during the summer season could have substantially contributed to the receivership estate.

The Superior Court granted the Receiver's motion and ordered Kevin to vacate the property by October 18, 2016. The order provided that, if Kevin did not vacate the property by 11:59 p.m. on October 18, 2016, the court would hold a hearing at 9:30 a.m. on October 19, 2016, to consider whether Kevin should be held in contempt of court. The Superior Court indeed held a hearing on October 19, as Kevin had not yet vacated the property. At that hearing, the Superior Court granted

Kevin an additional week to vacate the property; Kevin substantially complied with the order by removing himself and the children and most of his belongings.

Soon thereafter, the Receiver sold the property for $577,500. The sale closed on February 1, 2017. Citizens Bank had filed a motion to allow its secured claims related to the 2004 Mortgage and the 2006 Mortgage, which was granted on February 2, 2017. Allie filed a limited objection to the approval of the 2006 Mortgage, arguing that it should not be deducted against her interest because, despite what appears to be her signature on the document, she did not sign the 2006 mortgage deed, nor is her signature or name on the 2006 Note.

On February 17, 2017, the Receiver filed a First and Final Report (the Final Report) and, on February 19, 2017, he filed a Recommendation on Allowance of Claims (the Recommendation). The Recommendation suggested that Kevin's past-due rent, calculated to be $38,250,[8] should be added to the receivership estate, bringing the total cash-on-hand amount to $582,776.97. Next, the Receiver recommended that the receivership estate be divided equally, in accordance with the Sale Provision of the MSA, between Allie and Kevin, each being attributed $291,388.

The Recommendation then proposed that all court-approved administrative fees, costs, and expenses—estimated at $60,000—be deducted on the basis of a 30/70 split between Allie and Kevin, respectively. In the Final Report, the Receiver explained that Kevin "had caused numerous and substantial issues and delays" throughout the receivership proceedings, which had

---

[8] The Receiver calculated the total amount of rent due based on a rental rate of $2,250 per month for the months of May 2016, September 2016, and October 2016, and at a rental rate of $2,250 per week for the months of June 2016, July 2016, and August 2016 (three months at $2,250 = $6,750; and fourteen weeks at $2,250 = $31,500, for a total of $38,250). This amount was based on the recommendation of the real estate agent who facilitated the sale of the property.

"substantially" increased the fees. Therefore, he recommended that Kevin "should bear a greater burden of the Receiver's fees[.]"

Finally, the Receiver deducted the balance of the two Citizens Bank mortgages and an IRS claim solely from Kevin's share. The Receiver charged the $209,422.04 owed Citizens Bank to Kevin because only Kevin had signed both the 2004 Note and the 2006 Note. The Receiver also reported that several IRS liens, related exclusively to Kevin or Kevin's business, were filed against the property between December 2010 and April 2015, totaling over $323,000 with interest and penalties. The Receiver also included a final calculation of distribution, with an alternative calculation if the Superior Court determined that the 2004 Mortgage should be paid before distribution to Kevin and Allie.

Kevin filed a limited objection to the Final Report and the Recommendation on February 24, 2017. He objected to utilizing the Sale Provision, attributing the Citizens Bank loans solely to him, and charging him for past-due rent. He also objected to the 30/70 attribution of administrative fees; however, Kevin and Allie later resolved that dispute separately.

After conducting a hearing on March 3, 2017, and requesting supplemental memoranda from the parties, the Superior Court justice issued a decision on May 8, 2017, adopting the Receiver's recommendations. In his decision, the Superior Court justice concluded that the MSA "unambiguously" sets forth two paths for equity distribution: one in which Kevin pays all the property-related expenses for four years and "buys out" the property from Allie at 38 percent of the net equity value on December 31, 2009; and one in which Kevin fails to make all of those payments, the property is subsequently sold, and Allie and Kevin split the net proceeds equally.

The Superior Court justice next concluded that making use of the Sale Provision is correct because Kevin did not make a "buyout" payment equivalent to 38 percent of the property's net

equity to Allie on December 31, 2009. The Superior Court justice also determined that Allie was not responsible for the debts underlying the 2004 Mortgage and 2006 Mortgage because she did not sign the related notes. Finally, the Superior Court justice ruled that the Receiver's allocation of past-due rent to Kevin was proper because Kevin's financial obligations were reinstated upon the dismissal of the bankruptcy case. An order entered on May 25, 2017, from which Kevin timely appealed.[9]

## II

## Standard of Review

"A marriage settlement agreement 'that is not merged into a divorce judgment retains the characteristics of a contract.'" *Carney v. Carney*, 89 A.3d 772, 775 (R.I. 2014) (quoting *Riffenburg v. Riffenburg*, 585 A.2d 627, 630 (R.I. 1991)). Whether a contract is ambiguous is a question of law. *Paul v. Paul*, 986 A.2d 989, 993 (R.I. 2010). "'If a contract is clear and unambiguous, the meaning of its terms presents a question of law for the court,' which we review *de novo*." *McCulloch v. McCulloch*, 69 A.3d 810, 819 (R.I. 2013) (brackets omitted) (quoting *State Department of Environmental Management v. Administrative Adjudication Division*, 60 A.3d 921, 924 (R.I. 2012)).

## III

## Discussion

---

[9] Final judgment has not yet entered in this receivership case. The May 25, 2017 order, however, operates as final judgment for purposes of appeal because it is a final adjudication on the merits, effectively resolving the litigation between Kevin and Allie. *See Hill v. M. S. Alper & Son, Inc.*, 106 R.I. 38, 46, 256 A.2d 10, 14 (1969) (holding that, while an order directing the distribution of funds was not a final disposition of receivership proceedings, it was appealable because "it determined the merits of a controversy upon a distinct or separate division of the entire receivership matter, and therefore it had the degree of finality necessary to qualify for immediate review").

On appeal, Kevin advances three arguments. First, he asserts that the property's proper distribution under the MSA is clear and unambiguous, and that the Superior Court justice erred when he concluded that the net proceeds were to be distributed equally. Next, Kevin argues that the Superior Court justice erred when he attributed the 2004 Mortgage wholly to Kevin.[10] Finally, he maintains that he should not pay past-due rent because he never agreed to, nor was ordered to, make such rental payments.

## A

## Division of Equity Percentage

Kevin argues that, pursuant to the MSA, he should be awarded 62 percent of the proceeds from the sale of the property, rather than the 50 percent the Superior Court justice awarded him. He asserts that, because he made all payments required of him under Subsection 3(C) for the four-year period ending on December 31, 2009, he is entitled to purchase Allie's interest in the property for 38 percent of the net equity value.

In construing the terms of a contract, this Court's "main objective is to ascertain the parties' intent." *The Elena Carcieri Trust-1988 v. Enterprise Rent-A-Car Company of Rhode Island*, 871 A.2d 944, 947 (R.I. 2005). "In determining whether a contract is clear and unambiguous, the document must be viewed in its entirety and its language be given its plain, ordinary and usual meaning." *Cathay Cathay, Inc. v. Vindalu, LLC*, 962 A.2d 740, 746 (R.I. 2009) (brackets omitted) (quoting *Rubery v. Downing Corporation*, 760 A.2d 945, 947 (R.I. 2000)). "The determination of whether a contract's terms are ambiguous is a question of law to be decided by the court." *Botelho v. City of Pawtucket School Department*, 130 A.3d 172, 176 (R.I. 2016) (quoting *JPL Livery*

---

[10] Kevin concedes in his papers that he did not properly preserve for appeal any issue related to the 2006 Mortgage.

*Services, Inc. v. Rhode Island Department of Administration*, 88 A.3d 1134, 1142 (R.I. 2014)). "[W]e have consistently found that an agreement is ambiguous only when it is reasonably and clearly susceptible to more than one interpretation." *McBurney v. Teixeira*, 875 A.2d 439, 443 (R.I. 2005) (quoting *W.P. Associates v. Forcier, Inc.*, 637 A.2d 353, 356 (R.I. 1994)). The court should "refrain from engaging in mental gymnastics or from stretching the imagination to read ambiguity * * * where none is present." *Young v. Warwick Rollermagic Skating Center, Inc.*, 973 A.2d 553, 559 (R.I. 2009) (quoting *Mallane v. Holyoke Mutual Insurance Company in Salem*, 658 A.2d 18, 20 (R.I. 1995)). "When there is only one reasonable interpretation of a contract, the contract is deemed unambiguous." *Roadepot, LLC v. Home Depot, U.S.A., Inc.*, 163 A.3d 513, 519 (R.I. 2017). If we do not find ambiguity, "the intention of the parties must govern *if* that intention can be clearly inferred from the writing and if it can be fairly carried out in a manner consistent with settled rules of law." *W.P. Associates*, 637 A.2d at 356 (emphasis in original).

As the Superior Court justice noted, when read in its entirety, the MSA clearly sets forth two ways in which the property can be distributed as a marital asset. First, the Buyout Provision gives Kevin the opportunity to "buyout" Allie's interest in the property. Subsection 3(B) provides that Allie shall convey the property to Kevin "after the full and successful completion of all payments provided for herein[,]" which we deem to encompass both the four-year, property-related payments *and* the payment of 38 percent of the property's net equity value as of December 31, 2009. The MSA specifically provides, in Subsection 3(E), that "[Allie] shall convey to [Kevin] all right, title, and interest in and to said property contemporaneous with [Kevin's] payment of the net equity percentage due and owing to [Allie.]"

Alternatively, the Sale Provision provides for a contingent avenue if Kevin "is unable to make all payments as set forth herein[.]" In that case, the property is to be "placed on the market

- 11 -

for the best available price and sold as soon as possible" and the net proceeds are to be distributed equally.

We agree with the Superior Court justice that the contingent Sale Provision controls if the Buyout Provision is not perfected. Reading the MSA in an "ordinary, common sense manner[,]" *Carney*, 89 A.3d at 776 (quoting *Paul*, 982 A.2d at 993), the MSA first contemplates Kevin purchasing Allie's interest for 38 percent of the net equity value; and, secondly, it contemplates selling the property and dividing the net proceeds equally. We are of the opinion that the MSA, when read as a whole, plainly requires Kevin to make two types of payments in order to utilize the Buyout Provision. Although he did pay the property-related expenses for the required four-year period, he never tendered the 38 percent net equity payment to Allie.

We are, therefore, satisfied that the Superior Court justice correctly interpreted the MSA in concluding that the net proceeds of the property are to be divided equally between Kevin and Allie.

**B**

**Obligation of the Secured Claims**

Kevin further argues that the Superior Court justice erred when he attributed the debt underlying the 2004 Mortgage solely to Kevin's 50 percent share of the property's proceeds. He argues that, pursuant to the MSA, the outstanding 2004 Mortgage should be deducted equally from both Allie and Kevin's shares.[11] The Superior Court justice determined that Allie's lack of signature on the 2004 Note relieved her of any financial obligation to repay the loan under the 2004 Note. The Superior Court justice additionally reasoned that, because the relevant sentence

---

[11] Kevin also argues that the Superior Court justice erred when he attributed the debt underlying the 2006 Mortgage to his share, but, as noted above, he concedes that he waived this argument for appeal.

in Subsection 3(D) provides that Allie was entitled to 50 percent of the net *proceeds*, the use of the 2004 Mortgage in calculating net *equity* was irrelevant. We disagree.

Whether the balance of the 2004 Mortgage is deducted from the total proceeds of the sale before distributing equal shares to Kevin and Allie, or whether the mortgage balance is deducted solely from Kevin's share, turns on the meaning of the phrase "net proceeds." The Sale Provision of the MSA provides that Allie shall receive "fifty (50%) [percent] of the net proceeds" from the sale, whereas the Buyout Provision states that she shall receive "thirty-eight (38%) percent of the then existing net equity after deducting from said fair market value the outstanding mortgage balance on the Citizens Bank Mortgage." Moreover, in Subsection 3(A), Kevin and Allie agree that, at the time the MSA was executed, the fair market value of the property was $900,000, with an outstanding mortgage at the time of $360,000, "for net equity" of $540,000.[12] Thus, it is clear that the parties intended to deduct the outstanding mortgage from the fair market value in arriving at the "net equity" value.

We are of the opinion that a similar interpretation applies to the term "net proceeds." The fact that Allie did not sign the 2004 Note does not alter the analysis. She was clearly aware of the 2004 mortgage loan, she signed the mortgage deed, she recognized its existence in the MSA, and she agreed to deduct its outstanding balance in calculating the net equity value of the property. We are convinced, therefore, that the employment of the term "net proceeds" in this context is not ambiguous; it refers to the sale price of the real estate less all selling costs, including the payoff of existing mortgages.

---

[12] As noted *supra* at n.5, the outstanding amount of the 2004 Mortgage at the time the MSA was executed was $190,000.

- 13 -

Accordingly, we vacate paragraph two of the May 25, 2017 order to the extent that it deducts the entire balance of the 2004 Note from Kevin's share of the proceeds, and we remand the case to the Superior Court for a recalculation of the distribution of the net proceeds. In doing so, however, we are mindful that the total payoff of the 2004 Note may include late fees, penalties, and costs attributable to Kevin's failure to make payments in a timely manner. All such expenses should be charged to Kevin's share of the proceeds.

## C

### Rent

Finally, Kevin maintains that the Superior Court justice erred when he required Kevin to reimburse the receivership estate $38,250 from his share of the proceeds for past-due rent, arguing that no court order or agreement ever existed requiring him to pay rent. He further contends that the Superior Court justice failed to specify when the rent "properly started."

In fashioning the order with respect to the payment of past-due rent, it is clear that the Superior Court justice adopted the recommendation of the Receiver that the sum of $38,250 be added to the receivership estate before the estate be divided equally between Kevin and Allie. The Receiver detailed his calculations in the First and Final Report and the Request for Approval of Fees, Costs, and Expenses. He addressed rental payments for the period from April 26, 2016, through October 25, 2016, at the rate of $2,250 per month in May, September, and October, and at the rate of $2,250 per week during the months of June, July, and August. Although Kevin objected to the assessment of any past-due rent, he did not challenge the rental rates utilized by the Receiver.

It is our opinion that the Superior Court justice did not err in crediting the receivership estate the sum of $38,250 for the fair amount of rent that Kevin should have been paying during

the pendency of the receivership. Such an outcome is just and equitable in light of the fact that Kevin was able to reside in the former marital domicile for those six months rent-free, and in violation of a Family Court order. We perceive no error by the Superior Court justice in so ordering.

## IV

## Conclusion

For the reasons stated in this opinion, we vacate in part and affirm in part the order of the Superior Court. We remand the papers in the case to the Superior Court with directions to recalculate the distributions of the receivership estate by deducting the principal balance of the 2004 Note equally from the shares payable to Kevin Hunt and Allie Hunt.

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | In re: 25 Burnside Avenue, Narragansett, Rhode Island. |
| **Case Number** | No. 2018-36-Appeal.<br>(WC 16-208) |
| **Date Opinion Filed** | April 4, 2019 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Washington County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Brian P. Stern |
| **Attorney(s) on Appeal** | For Appellant:<br><br>Eric H. Miller, Esq.<br>Seth A. Perlmutter, Esq. |
| | For Appellee:<br><br>Douglas J. Emanuel, Esq. |